**LITTLE ROCK SCHOOL DISTRICT,**
**Plaintiff,**

v.

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Arkansas State Board of Education; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love; Bob Lyon; John Ward; Judy Wear; Leon Barnes; Marianne Gosser; Steve Morley; Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines; and Dale Ward, Defendants.**

No. LR–C–82–866.

United States District Court,
E.D. Arkansas, W.D.

April 13, 1984.

See also, D.C., 560 F.Supp. 876.

Philip E. Kaplan, John M. Bilheimer, Janet L. Pulliam, Little Rock, Ark., for plaintiff.

Friedman & Koven, Chicago Ill., Wright, Lindsey & Jennings, W.H. Dillahunty, Steve Clark, Ark. Atty. Gen., Stephen Curry, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### I.

### DESEGREGATION LITIGATION IN THE THREE DISTRICTS

#### A. THE LITTLE ROCK SCHOOL DISTRICT

Nothing better illustrates the failure of the separate but equal doctrine [1] than the school situation in Pulaski County, Arkansas in 1930. There were 2500 black students in the Pulaski County School District, which embraced all of Pulaski County outside Little Rock and North Little Rock. Twelve of these students were attending senior high school. Eight were in the tenth grade, four in the eleventh and none in the twelfth. There was one black high school (if such it could be called)—the Pulaski County Training School. (PX 52) One of the justifications for this shocking fact was "any residents of the County who might want a 'city school education' would find the school systems of Little Rock and North Little Rock in easy reach." (PX 52) This statement was partially true, since Little Rock's Dunbar High School, which opened in 1930 with a 1600 student capacity, was "considered at that time the most modern and complete public high school building in the United States created specifically for negroes." (PX 52) Dunbar contained "thirty-four classrooms, physics, chemistry and biology laboratories, a library with 8,000 volumes, a commercial department, a foods laboratory, an auditorium and stage with modern lighting equipment, three clothing laboratories, a cafeteria, a laundry, and shops for carpentry, woodwork, plumbing, electricity, automobile mechanics, brick laying, and printing." (PX 52)

It is quite understandable that ambitious black students from Pulaski County and North Little Rock and indeed from the far corners of Arkansas would make a pilgrimage to Dunbar. The sad fact is that in few localities in Arkansas were blacks furnished a decent and acceptable high school education. Dr. Leroy M. Christopher, former principal of Dunbar and retired principal of Howard High School in Wilmington, Delaware, testified how he came to Little Rock from his family home at Forrest City, one hundred miles distant, to get a high school education in the Little Rock School District since none was available in his home community. (T 17–19) Going to Gibbs High School, the predecessor to Dunbar and located on the same site, was described by Dr. Christopher in these terms: "Well, in those days everybody knew that —well, we used to call the schools in Little Rock "Heavenly Schools" because everybody wanted to go—it's kind of like going to heaven, you know. I mean, when you're

---

**1.** *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

a child, when we were children everybody looked forward to something good, and so we all looked forward to what we called "Heavenly Schools" over here in Little Rock, Arkansas."

A study published in 1941 referred to the "influx of students to Dunbar from neighboring sections .... drawn to Little Rock because of inferior educational facilities in their own towns." (PX 52) In 1938–39 Little Rock was spending $39.54 for each black pupil, North Little Rock, $16.33, and Pulaski County, $13.74. (PX 52). From the 1938–39 school year until the 1946–47 school year, no more than three percent of all black students in the Pulaski County School District were enrolled in high school as compared to 9–12 percent in North Little Rock and 12–16 percent in Little Rock. (PX 52)

During this period schools in Arkansas were evaluated in descending order as follows. The highest rating was an accreditation by the North Central Association followed by an (A), (B) and (C) rating by the State Department of Education. An unaccredited school was given an (X) (T 160; PX 52). As late as 1950 Dunbar High School in the Little Rock School District was the only black high school in Pulaski County with a North Central accreditation. Jones High School in North Little Rock had a (B) rating in 1940 and an (A) rating in 1950. The Pulaski County District in 1950 had two black high schools—Pulaski County Training School at McAlmont and J.C. Cook at Wrightsville. The former had a (C) rating and the latter an (X) or unaccredited rating. (PX 52)

Before *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the only way a black student living outside the Little Rock School District could get a high school education from a North Central accredited school was to find some way to gain access to Dunbar High School or its predecessor, Gibbs High School. Fortunately, these schools did not look askance at the residence of those who appeared at their doors. Some like Dr. Christopher came from Forrest City (T. 17).

Some like Mrs. Annie Abrams came from Arkadelphia (PX 52). Some came from North Little Rock and many came from the Pulaski County School District, which had not even the semblance of an accredited black high school.

As far as the education of blacks was concerned, school district boundaries in Pulaski County were ignored. There was interdistrict cooperation in the time period between the two World Wars as to busing and student transfers. The latter were freely made, both formally and informally, the largest volume being from the Pulaski County Special School District to the Little Rock and North Little Rock School Districts.

It cannot be seriously denied that the Little Rock School District's maintenance of the only North Central accredited black high school in the County and indeed in the entire area led to a concentration of blacks in this district. For almost half a century it has not only assumed the burden of giving a quality education to blacks in the County and from far corners of the State but has also been the object of racially motivated attacks by certain political and cultural groups.

Two years after the *Brown* decision, an amendment to the Arkansas Constitution was adopted which disinterred the discredited doctrine of nullification (and which still remains as Amendment 44). Section 1 of this amendment, sponsored by the political leadership of this state, reads as follows:

> From and after the Adoption of this Amendment, the General Assembly of the State of Arkansas shall take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional [sic] desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court, including interposing the sovereignty of the State of Arkansas to the end of nullification of these and all deliberate, palpable and dangerous invasions of or encroachments upon rights and powers not delegated to the United States nor prohibited to the States by the Constitution of the United

States and Amendments thereto, and those rights and powers reserved to the States and to the People thereof by any department, commission, officer, or employee of such department or commission of the Government of the United States, or of any government of any Nation or Federation of Nations acting upon the apparent authority granted them by or assumed by them from the Government of the United States. Said opposition shall continue steadfast until such time as such Un-Constitutional [sic] invasions or encroachments shall have abated or shall have rectified, or the same shall be transformed into an Amendment to the Constitution of the United States and adopted by action of three-fourths of the States as provided therein.

The spirit and letter of this amendment was invoked against the Little Rock School District when in September, 1957 it sought to admit nine black students to Central High School in conformity with an order of this court based upon *Brown v. Board of Education, supra.* Their entrance was barred by National Guardsmen on order of Governor Orval Faubus. The Little Rock School Board had formally stated its intention to comply with *Brown* three days after that decision was rendered: "It is our responsibility to comply with Federal Constitutional Requirements and we intend to do so when the Supreme Court of the United States outlines the method to be followed." *Cooper v. Aaron*, 358 U.S. 1, 7, 78 S.Ct. 1401, 1404, 3 L.Ed.2d 5 (1958).

The tragic history of the Central High case is recited by the Supreme Court in *Cooper v. Aaron, supra*, pp. 8–12, 78 S.Ct. pp. 1404–1406. After adopting the above statement of policy, the Board instructed the Superintendent of Schools, Virgil Blossom, to prepare a plan for desegregation, which was approved on May 24, 1955, seven days before the Supreme Court's second opinion in *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Desegregation of the Little Rock schools would begin at senior high level and would be progressively extended downward. "Following the adoption of this plan, the Superintendent of Schools discussed it with a large number of citizen groups in the City. As a result of these discussions, the Board reached the conclusion that 'a large majority of the residents' of Little Rock were of 'the belief ... that the Plan, although objectionable in principle,' from the point of view of those supporting segregated schools 'was still the best for the interests of all pupils in the District.'" *Id.* 358 U.S. at 8, 78 S.Ct. at 1405. The plan was upheld in the District Court [2] and the Court of Appeals.[3] There was no appeal from these judgments to the Supreme Court. "While the School Board was thus going forward with its preparation for desegregating the Little Rock school system, other state authorities, in contrast, were actively pursuing a program designed to perpetuate in Arkansas the system of racial segregation which this court had held violated the Fourteenth Amendment." *Id.* at 8, 78 S.Ct. at 1405. The Legislature in 1957 enacted and Governor Faubus signed a pupil assignment law, a statute relieving school children from compulsory attendance at racially mixed schools, and a statute establishing a state sovereignty Commission, which was given the broadest possible powers to:

(a) Perform any and all acts and things deemed necessary and proper to protect the sovereignty of the State of Arkansas, and her sister states from encroachment thereon by the Federal Government or any branch, department or agency thereof, and to resist the usurpation of the rights and powers reserved to this State or our sister states by the Federal Government or any branch, department or agency thereof.

.    .    .    .    .

(d) Give such advice and provide such legal assistance as the Commission considers necessary or expedient, when requested in writing to do so by resolution adopted by the governing authority of

---

**2.** *Aaron v. Cooper,* 143 F.Supp. 855.

**3.** *Aaron v. Cooper,* 243 F.2d 361 (8th Cir.1957).

any school district, upon matters, whether involving civil or criminal litigation or otherwise, relating to the commingling [sic] of races in the public schools of the State; such advice and legal assistance to be rendered under such rules and regulations as the Commission may adopt.

(e) Study and collect information concerning economic, social and legal development constituting deliberate, palpable and dangerous invasions of or encroachments upon the rights and powers of the State reserved to the State under Amendment Number Ten to the Constitution of the United States.

The Little Rock School District nevertheless continued with preparations to carry out its desegregation program. Nine black children out of two thousand students were scheduled for admission upon the opening of school in September, 1957. However, these plans met "with drastic opposing action on the part of the Governor of Arkansas who dispatched units of the Arkansas National Guard to the Central High School grounds and placed the school 'off limits' to colored students. As found by the District Court in subsequent proceedings, the Governor's participation had not been requested by the school authorities and was entirely unheralded." 358 U.S. at 9, 78 S.Ct. at 1405.

When the children attempted to enter Central High School on September 4, 1957, units of the Arkansas National Guard "acting pursuant to the Governor's order stood shoulder to shoulder ... and thereby forcibly prevented the nine ... from entering .... They did not prevent any white students from entering the school." *Aaron v. Cooper*, 156 F.Supp. 220, 225 (E.D.Ark. 1957). This outrageous conduct in direct violation of a lawful order of this court, never reversed or modified on appeal, was continued for three weeks. 156 F.Supp. at 225. On September 2, 1957 U.S. District Judge Ronald Davies, sitting by assignment, enjoined the actions of Faubus and his military subordinates "to protect and preserve the judicial proceedings of this

Court, to maintain the due and proper administration of justice, and to protect the constitutional rights of the minor plaintiffs." *Id.* at 226. Judge Davies was unanimously affirmed by the Court of Appeals. *Faubus v. United States*, 254 F.2d 797 (8th Cir.1958). After the issuance of the injunction, the National Guard was withdrawn and on Monday, September 23, 1957 the nine black students entered Central High School in the face of a large and unruly crowd, led and encouraged by violent extremists many of whom were imported from outside the City of Little Rock. The officers on duty had difficulty controlling the hostile mob. They advised the Superintendent to remove the children from the school, which was done.[4] To insure the safety of the children and the enforcement of the order of the court, President Eisenhower then dispatched federal troops to Central High School. They were later replaced by federalized National Guardsmen who remained throughout the year. Eight of the students remained in attendance through the school year, 1957–58.

On June 20, 1958 Judge Harry Lemley granted a two-year postponement of the integration plan. *Aaron v. Cooper*, 163 F.Supp. 13 (E.D.Ark.1958). His order was promptly reversed by the Court of Appeals on August 18, 1958. The opinion by Judge Matthes bespoke the difficulties of the Little Rock School District and its Board. "As we have seen, they have been constantly harassed; they have met with overt opposition from the public, and the legislature through passage of the 1957 enactments. The executive department of the State of Arkansas has openly opposed their efforts, as demonstrated by the Governor's statement of the official policy of the State of Arkansas against integration, followed by the use of National Guardsmen to prevent entry of Negro students." *Aaron v. Cooper*, 257 F.2d 33, 39 (8th Cir.1958). Judge Matthes closed his opinion with a ringing affirmation of the rule of law and the absolute necessity for obedience to the

---

**4.** *Aaron v. Cooper*, 163 F.Supp. 13, 16 (E.D.Ark. 1958).

lawful orders of a court of law by all within its jurisdiction—whether he be a governor, an ordinary citizen, or even the President of the United States. "The issue plainly comes down to the question of whether overt public resistance, including mob protest, constitutes sufficient cause to nullify an order of the federal courts directing the Board to proceed with its integration plan. *We say the time has not yet come in these United States when an order of a Federal Court must be whittled away, watered down or shamefully withdrawn in the face of violent and unlawful acts of individual citizens in opposition thereto.* (Emphasis by the Court.) *Aaron v. Cooper,* 257 F.2d 33, 40 (8th Cir.1958).

In its opinion rendered September 12, 1958 affirming the Court of Appeals, the Supreme Court quoted with approval a pleading filed by the School Board. "The legislative, executive, and judicial departments of the state government opposed the desegregation of Little Rock schools by enacting laws, calling out troops, making statements villifying federal law and federal courts, and failing to utilize state law enforcement agencies and judicial processes to maintain public peace." *Cooper v. Aaron,* 358 U.S. 1, 15, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5 (1958). After fully reviewing the events at Central High School, the Supreme Court reaffirmed several basic principles which must never be disregarded if this nation is to remain a constitutional democracy dedicated to a rule of law:

> The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and legislature.... In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously."

Article VI of the Constitution makes the Constitution the "supreme Law of the Land." In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as the "the fundamental and paramount law of the nation," declared in the notable case of *Marbury v. Madison,* 1 Cranch 137, 177 [2 L.Ed. 60], that "It is emphatically the province and duty of the judicial department to say what the law is." This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the *Brown* case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, "to support this Constitution."

No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it.

358 U.S. 1, 16–18, 78 S.Ct. 1401, 1408–1409, 3 L.Ed.2d 5.

While the appeal in the above case was pending and after his nomination in the summer primaries of 1958, Governor Faubus called a special session of the Legislature to meet in August of 1958. At his behest the Legislature passed Act 4 which authorized him, by proclamation, to close any or all public schools within any school district pending a referendum "for" or "against" the "racial integration of all schools within the school district." Act 9 authorized the removal by recall of any or all members of local school district boards. Act 6 permitted students to transfer to segregated schools across district lines if

the schools they ordinarily attended were to be desegregated, and by a later 1959 statute the State of Arkansas picked up the bill for these transfers even if they were to private schools. Ark. Acts 1959 No. 236.

On September 13, 1958, the day after the Supreme Court rendered its decision in *Aaron v. Cooper, supra,* Faubus issued a proclamation closing the four Little Rock High Schools, white and black. They remained closed throughout the 1958–59 school year. Thus, the education of 3,400 high school students in the Little Rock School District was interrupted. (PX 65) For many students it was never resumed.

On November 15, 1958 the five moderate members of the School Board resigned in frustration, leaving one avowed segregationist on the Board, who was elected to Congress in a write-in campaign against a popular eight-term Congressman. Moderates in Little Rock nominated five candidates for election to the School Board at the regular school election on December 6, 1958. Three of these were elected, leaving the Board equally divided between segregationists and the moderates, whom the Governor branded publicly as "integrationists." (PX 65) All three of the latter were prominent, conservative businessmen. The three segregationists on the Board voted not to renew the contracts of 44 teachers in the Little Rock School District whom they described as "integrationists or individuals who collaborated with integrationists." (PX 65) Renewal of the contracts required a majority of the School Board. Dismissal of these teachers, many of whom were the best and most experienced teachers in the district, galvanized a few leading citizens into activity and brought into being an organization, the Women's Emergency Committee, which would spearhead the movement to retain the dismissed teachers and to reopen the schools. The leadership and commitment of this group of dedicated women made possible the first victory for the moderate forces since the controversy had begun over integration of the Little Rock School District. The Women's Emergency Committee became the active and front-line component of a broader move-

ment called STOP (Stop This Outrageous Purge) which determined to force the teacher dismissal issue by recalling the segregationist members of the School Board. Thus, a part of the Faubus 1957 legislative package would be used to thwart the teacher firing. The Governor's supporters retaliated with petitions to recall those on the Board opposed to the teacher dismissals. A coalition composed of representatives from the Chamber of Commerce, labor, parent-teacher associations and black groups, organized and spearheaded by the Women's Emergency Committee, was victorious in the recall election. The segregationists were recalled; the moderates were retained. (PX 65) Act. 4, the school closing legislation, was declared unconstitutional by a three-judge federal court on June 18, 1959 and the way was thus cleared to reopen the closed schools for the 1959–60 school term. *Aaron v. McKinley,* 173 F.Supp. 944 (E.D. Ark.1959).

The election of a School Board committed to a rule of law did not by any means solve the problems of the Little Rock School District. Until January, 1967 it was faced with a hostile governor and state administration and an unfriendly legislature. As detailed by Judge Matthes in *Clark v. Board of Education of Little Rock School Dist.,* 426 F.2d 1035 (8th Cir.1970) *cert. denied* 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971), a number of desegregation plans were advanced by the School Board in the decade of 1960 in a good faith effort to provide a solution to continuous litigation. Two of the best known plans, one advanced by a team of experts from the University of Oregon and the other by School Superintendent Floyd Parsons, failed in the hysterical political atmosphere of that period. There was, however, significant progress in desegregating the Little Rock Schools. In the 1969–70 school year Central High School, the scene of so much turmoil ten years earlier, had 1542 white students and 512 blacks. "Where before Negro teachers were heavily concentrated in those schools long identified as Negro,

they are now distributed throughout the District so that no school has more than 50% Negro teachers." 426 F.2d at 1041. In 1971 the Court of Appeals approved a plan for the desegregation of grades 6 through 12 in the Little Rock School District. *Clark v. Board of Education and the Little Rock School District,* 449 F.2d 493 (8th Cir.1971), *cert. denied* 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1971). The School Board plan for integration of the elementary grades in the Little Rock District was approved with some modification in *Clark v. Board of Education of Little Rock School District,* 465 F.2d 1044 (8th Cir.1972), *cert. denied* 413 U.S. 923, 93 S.Ct. 3054, 37 L.Ed.2d 1044 (1973).

In the most recent decision involving the Little Rock School District, the Court of Appeals affirmed Judge Overton's approval of what is known as the "Partial K–6" plan for the elementary grades. *Clark v. Board of Education of the Little Rock School District,* 705 F.2d 265 (8th Cir. 1983). This decision has important implications for the case at bar and contains significant statistical history with regard to the changing racial makeup of the Little Rock School District. In the 1973–74 school year 48% of the 21,095 students in the Little Rock District were black. By the 1976–77 year the percentage had increased to 54%. During the same period the range of blacks in the elementary grades had increased from 41–77% to 31–90%; in the middle school from 44–58% to 44–60%; in junior and senior high schools the percentages remained fairly constant.

By the fall of 1981, three thousand less students were enrolled in the Little Rock School District than in the fall of 1973. The percentage of black students had increased from 48% to 65%. Seventy-six percent of the elementary students were black, compared to 69% of the intermediate students, 62% of the junior high school students and 55% of the high school students. "The district court found that the decline in the percentage of white students enrolled in the Little Rock public schools could generally be explained by the movement of white families from the district to the suburbs, some of them to avoid sending their children to integrated schools, and by an increase in the black population in the school district, caused in part by a higher birth rate in the black population." 705 F.2d at 267. The Court of Appeals noted and emphasized the 1980 remark of the school's Superintendent that "Little Rock is fast becoming a black school district." A team from Stephen F. Austin State University was retained to survey the problem. Its December, 1981 report confirmed the superintendent's assessment "that if the demographic shifts and white flight continued, the school district would have an all-black enrollment within the next few years.... Black students were being bused to schools in which they attended virtually all-black classes. Financial support of the schools was eroding, and the public's confidence in the ability of the public school system to provide quality education was decreasing." 705 F.2d at 271.

The "Partial K–6" plan was a response to these critical problems. It increased black enrollment of four elementary schools in black neighborhoods—Carver, Ish, Mitchell and Rightsell—to the point where they were virtually all black. It reduced blacks in five white or integrated neighborhoods and in one school located in a black neighborhood. "The theory behind the adopted plan was that by making these changes in enrollment patterns, integrated schools could be preserved at least for a time in the six schools listed and in a number of other schools in which smaller adjustments were made." 705 F.2d at 270.

The School Board and the Court of Appeals both noted that the above steps were only stopgap measures. "The plan as adopted represented the Board's attempt to temporarily reorganize attendance patterns while the School Board pursued longer range plans to ensure an integrated school system." 705 F.2d 265. Significantly the Court alluded to the case at bar as such a possible solution, quoting in some detail from the relief sought in the complaint.

The Superintendent's prophecy concerning the racial makeup of the Little Rock School District is being rapidly realized. Enrollment by race in the District schools for the year 1983–84 is shown in Exhibits 1, 2 and 3 to this opinion. Exhibit 1 shows the elementary school breakdown of enrollment; Exhibit 2 shows the junior high school enrollment breakdown; and Exhibit 3 shows the senior high school enrollment breakdown.

As will be later established, there is considerable difference in the attitude of the Board and staff of the Little Rock School District vis-a-vis integration and the attitude of defendants. It can be safely said that the former is striving mightily to eliminate segregation "root and branch" from the Little Rock schools; efforts of the latter leave much to be desired. The Little Rock effort is reflected by its programs, policies, resource commitment, and the high percentage of black teachers and staff members. Educational opportunities for black students are thus provided in many ways that are absent in the other systems.

## B. THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT

There was little or no integration in the Pulaski County Special School District until a private desegregation suit was filed in 1968. *Zinnamon v. Board of Education of the Pulaski County Arkansas Special School District*, No. LR–68–C–154. As a result of this litigation, the District filed a plan for the 1971–72 school year which was approved with some modification by then District Judge J. Smith Henley. Their plan called for integration of staff and faculty and a limited integration of four elementary schools, whose enrollment was 12,453 whites and 2,901 blacks (19%). Under the plan six of the twenty-seven schools would be all white. Almost half the blacks were concentrated in three schools: College Station with 510 blacks and 11 whites; Cook with 463 blacks and 76 whites; and Scott with 253 blacks and 141 whites. In a number of other schools the black minority was far below 19%. Only one black was

projected for Lawson School; 10 at Bayou Meto (out of 919); 28 at Landmark (out of 388); 38 at Mabelvale (out of 642); 68 at Sylvan Hills (out of 710). With reference to the situation in the elementary schools, Judge Henley stated "that more is going to have to be done about the elementary schools in the future." (Mem. Op. p. 5)

The district then operated four senior high schools, two junior-senior high schools and seven junior high schools. The total projected enrollment for the 1971 school year was 11,000 with about 9% being black. Under its plan students would be assigned to these schools on the basis of geographical attendance zones. (PCSSD X 53) Judge Henley found that racial balance could not be achieved without a radical redistricting of the secondary school system because "there are simply not enough black secondary students in the district." (Mem. Op. p. 7) An appeal was taken from Judge Henley's decision, which was subsequently dismissed.

In June, 1973 the parties to this litigation entered into a consent decree which, among other things, required:

A. At least six black elementary school principals and two black secondary principals.

B. School construction plans which are not racially discriminatory.

C. Bi-Racial Committees and the appointment of two blacks as ex-officio members of the School Board.

D. Use of the criteria found in *Swann* in the construction of new schools.

E. Black teachers to be employed in proportion to the ratio of black pupils in the district.

F. The assignment of pupils to various schools so that there would be no racially identifiable schools. (T 202)

In a number of respects there has not even been minimal compliance with the mandates of this decree. The selection of sites for new schools built after the entry of the *Zinnamon* decree has been made without any consideration for the impact such selection would have on desegrega-

tion. The Pulaski County Special School District has never made an attempt to establish a bi-racial committee as required by the *Zinnamon* decree nor has it complied with the mandate requiring that two black citizens elected and selected by the black community serve in an ex-officio capacity on its Board of Education. The District has never instituted any procedure as required by *Zinnamon* to encourage administrators to structure curricular and extracurricular activities to insure the participation of a proportionate number of blacks.

Blacks are underrepresented in the central administration and in teaching positions in the district. Paragraph 4(e) of the *Zinnamon* decree required that the district operate a unified school system so that "each school would (except one or two schools distant from the black community) have a black enrollment of not less than ten nor more than twenty-five percent." Ten years after this direct mandate of Judge Henley, fifty percent of the schools are not in compliance therewith, as admitted by the Superintendent.

In summary, the Pulaski County Special School District Board has failed to demonstrate any efforts or intentions to comply with the directives of the *Zinnamon* decree or to eliminate the last vestiges of segregation as required by Judge Henley's order.

## C. THE NORTH LITTLE ROCK SCHOOL DISTRICT

While desegregation of the Little Rock schools began in 1957, no effort was made to desegregate the North Little Rock schools until the opening of the 1964 term some ten years after *Brown v. Board of Education, supra* was decided. A freedom of choice plan adopted in 1965 brought 117 blacks into white schools in 1965–66; 468 in 1966–67; 625 in 1967–68; and 712 in 1968–69. In 1968–69 the total enrollment in the North Little Rock School District was 12,879, of which 2,887 were blacks. No white student ever expressed a desire to attend a black school and none was ever assigned to such a school. *Graves v. Board of Education of North Little Rock School District*, 299 F.Supp. 843, 846 (E.D. Ark.1969). In response to litigation by blacks, the District came forward with a desegregation plan for the 1969–70 school year which Judge Henley declined to approve since the plan would maintain "an essentially segregated faculty" and a freedom of choice plan which had not "served to disestablish the existing dual elementary school system." Judge Henley noted that there was no reason "to believe that any white 10th or 11th grader will choose to go to Jones High School [black]." *Id.* at 848. The District was directed to file an amended plan, which it submitted on May 14, 1969. The amended plan for the 20 elementary schools proposed attendance zones under which ten of the twenty elementary schools would be all white and one all black; of the remaining nine schools, six had minorities of four percent or less. *Graves v. Board of Education of No. Little Rock, Ark. Sch. Dist.*, 302 F.Supp. 136, 139–140 (E.D.Ark.1969). Minorities in the other three ranged from 11% to 31%. *Id.* at 140. Judge Henley approved the attendance zone plan for one year only and warned that "the Board is ultimately going to have to devise another method for assigning elementary students to particular schools." *Id.* at 141. The Board was ordered to completely desegregate staff and faculty in the 1970–71 school year. This position was substantially maintained by Judge Henley in an unpublished opinion rendered in August, 1970. There was an appeal to the Court of Appeals which remanded the case to the District Court for further consideration in view of a series of recent Supreme Court cases.[5] The Court was directed to call for a new plan no later than August 1, 1971. North Little Rock filed a new plan on June 8, 1971. Judge

5. *Swann v. Charlotte Mecklenburg Bd. of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Davis v. Board of Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *North Carolina State Bd. of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).

Henley questioned the sufficiency of this plan and an alternative plan was submitted known as the "Storm" plan, named for a member of the Board who was its principal author. "Under it the twenty elementary schools of the District are divided into four groups with each group containing one of the traditional black schools. The heart of the plan is the transfer of large numbers of black students from the black schools in the respective groups to the white schools in these groups and replacing them with white students." *Davis v. Board of Education of North Little Rock, Ark.,* 328 F.Supp. 1197, 1202 (E.D.Ark.1971). Judge Henley approved this plan but because it required busing and the North Little Rock School District had no such provision, implementation of the "Storm" plan was deferred until the 1972–73 school year, twenty years after *Brown v. Board of Education, supra.*

With respect to the operation of the Storm plan at the secondary level, a short explanation is in order. The geographical attendance zones for the two high schools are defined by a north-south line bisecting the city into eastern and western divisions. Interstate 30 serves as the divider between these two zones in the southern half of the city. Ole Main High School is centrally located south of I–40 and west of I–30, a short distance from their intersection. Northeast High School, located north of I–40 and east of I–30, is not centrally located. Lakewood Junior High shares a campus with Northeast High School. Prior to 1969 Jones High School was maintained as an all-black facility in the Pine Addition, an almost totally black area. Under the Storm plan it was converted to a school for all seventh grade students and renamed Central Junior High School. Because of deterioration of this facility from a physical standpoint, the Board petitioned to close it and transfer all the seventh graders to the Poplar Street School. This court approved the Board's petition and was affirmed by the Court of Appeals. *Davis v. Board of Education of North Little Rock, Ark. Sch. Dist.,* 520 F.Supp. 108 (E.D.Ark.1981) *affirmed* 674 F.2d 684 (8th Cir.1982). Eighth

and ninth grade students attend Ridge Road, Lakewood and Rose City schools. The black percentage of students at these schools in the 1981–82 school year ranged from 28% to 35%. 674 F.2d 684, 688 n. 6.

The "Storm" plan was approved by the Court of Appeals. *Davis v. Board of Education of North Little Rock, Ark. Sch. Dist.,* 449 F.2d 500 (8th Cir.1971). At the same time the District Court was directed "to modify its decree to require the board to establish and implement standards with respect to the reassignment of faculty and staff ...." *Id.* at 502. On August 10, 1973 Judge Henley reluctantly approved the District's plan for segregated kindergartens. *Davis v. Board of Education of North Little Rock, Ark. Sch. Dist.,* 362 F.Supp. 730 (E.D.Ark.1973).

After an unreported hearing before Judge Terry Shell, the District was ordered to provide additional transportation to black students residing in the Dixie addition who were required to attend Northeast High School. Judge Shell was affirmed by the Court of Appeals. *Davis v. Board of Education of North Little Rock, Ark.,* 635 F.2d 730 (8th Cir.1980), *cert. denied,* 454 U.S. 904, 102 S.Ct. 413, 70 L.Ed.2d 223 (1981). "Judge Shell noted that although twenty-six percent of the students and twenty percent of the faculty were black, only one of the twenty-three administrators and supervisors in the central office was black; that only five of the twenty-six principals were black (four of the five being assigned to elementary schools); that only two of the fourteen guidance counselors were black; and that only two of the librarians or audiovisual staff assistants were black." *Id.* at 732. To ameliorate this situation Judge Shell mandated specific recruitment policies, notices of vacancies, and employment criteria, all of which were affirmed by the Court of Appeals. *Id.* at 733. The Court of Appeals made the following significant comments:

> We also note that the record is replete with evidence that black students do not participate in proportion to their numbers in certain extracurricular activities ....

The record also shows that black students are suspended more frequently than white students and that they tend to be numerically overrepresented in the special education classes for slow learners.

*Id.* at 733.

At the present time the North Little Rock School District has only one black on its administrative staff and one black high school coach. Black teachers are also underrepresented. An even more disturbing fact, as recently noted by the Court of Appeals, is that twenty percent of the blacks in the North Little Rock District are classified as being mentally retarded or as having learning disabilities.

## II.

### FINDINGS OF FACT

In addition to the findings contained in the Court's discussion of the desegregation litigation in the three districts, the Court makes the following findings:

### Background

1. Three school districts serve public school students in Pulaski County, Arkansas: the Little Rock School District, the North Little Rock School District, and Pulaski County Special School District No. 1.

2. Pulaski County can best be described as one large metropolitan area. Although the Arkansas River dissects the cities of Little Rock and North Little Rock, the presence of five major transportation bridges renders any transportation barriers meaningless. (PX 35)

3. The boundaries of the Little Rock School District and the City of Little Rock are not coterminous. While the City of Little Rock encompasses approximately 91 square miles, the Little Rock School District covers 53 square miles. (PX 63 at 9–10) Approximately 40 percent of the City of Little Rock falls outside of the Little Rock School District.

The student population of the Little Rock School District for 1983–84 is 19,052 (70% black—30% white). (T. 1448) There are 27 elementary schools and 9 secondary schools. (PX 63 at 228–229, 233 and 235)

4. The North Little Rock School District boundaries cover an area of approximately 26 square miles and for the most part encompass all of the City of North Little Rock. (PX 35 and PX 63 at 9–10)

The student population (excluding kindergarten) of the North Little Rock School District for 1983–84 is 9,051 (36% black—64% white). (D NLR X 3) There are 18 elementary schools and 6 secondary schools. (PX 63 at 230, 233 and 235)

5. The Pulaski County Special School District serves an area of approximately 755 square miles and includes the remaining parts of Pulaski County not included in the Little Rock School District or the North Little Rock School District. (PX 35)

The student population of the Pulaski County Special School District for 1983–84 is 27,839 (22% black—78% white). (D PCSSD X 64, Table 1) There are 31 elementary schools, 16 secondary schools and 2 kindergarten centers. (PX 63 at 231–32, 233–34, 235)

6. The three school districts are and for many years have been subject to judicial decrees requiring them to disestablish their previously existing dual school systems. None of the districts have been declared unitary. The history of the litigation involving these districts has been set forth, *supra.*

### Interdistrict Cooperation

7. Until approximately 1968, a historical pattern of interdistrict cooperation (e.g. student transfers and deannexation of territory by the Pulaski County Special School District) existed among the three districts. (PX 36, T 91–95, T 124–28) An independent study of the status of education in Pulaski County done in 1960 referred to the "excessively high amount of transference of pupils among schools across district lines." (Jt. X 5, p. 3)

8. Transportation across district lines was often relied upon to accomplish these

voluntary interdistrict transfers. (T. 115, 118, 129–32)

9. Both the North Little Rock School District and the Pulaski County Special School District accepted white children from the Little Rock School District when the Little Rock schools were closed in 1958. (T. 130, PX 36, PX 12, 10–30–58, 8–13–59)

10. Participation by the North Little Rock School District in interdistrict transfers declined substantially when it became embroiled in the litigation challenging its dual school system. (T. 1163)

11. In addition to formal transfers, it was a common practice for black students to "move" to the Little Rock School District from the defendant districts by simply coming to Little Rock to live with a relative. (T. 84–85, 91–92) Since the students reported a Little Rock address, they did not appear on the official transfer report form. The number of black transfers to the Little Rock School District from these two defendant districts has therefore been consistently understated.

12. Informal, but frequent, "breakfast meetings" between the three school superintendents took place during the 1960's to discuss school operations and consolidation was often discussed. (T. 1124–1125, 1129)

These "breakfast meetings" were also attended by city officials of Little Rock and North Little Rock as well as representatives from the two city housing authorities. (T. 1125)

13. Historically, as the boundaries of the City of Little Rock expanded, the Pulaski County Special District willingly permitted the Little Rock School District to annex portions of the Pulaski County Special School District. (T. 69)

14. An annexation in 1964 was accomplished for the purposes of building a new vocational high school (Metropolitan High) to be operated by the Little Rock School District, but to serve all three districts. A narrow strip of land extending approximately three miles into the Pulaski County Special School District was the subject of the annexation, and Metropolitan High continues to educate students from all three districts. (PX 1)

15. The practice of expanding school district boundaries as city boundaries expanded continued until the last two annexations of residential territory to the Little Rock School District which occurred in 1967 and 1968.

16. The historic intention that the boundaries of the Cities of Little Rock and North Little Rock remain coterminous with the respective school districts is found in a September 19, 1944 resolution of the Pulaski County Board of Education:

"[I]t is therefore by the Board ordered that all of Pulaski County outside the territory embraced in the cities of Little Rock and North Little Rock be created and organized into a special school district to be named and known as the Pulaski County Special School District. (PCSSD X 41)

*Voluntary Consolidation Efforts*

17. Two major efforts to consolidate the districts took place in 1960 and 1967. (PX 20–23, 25, 35 and T. 1146–1147)

18. It is clear from reading the minutes of the Pulaski County Special School District and accompanying resolutions concerning consolidation that the board members of the Pulaski County Special School District were concerned primarily with the educational opportunities of all of the Pulaski County school children and were not simply focusing their interests on students within their district boundaries. (PX 20–23, 25, 35)

19. Similarly when consolidation was discussed, the North Little Rock School District Board members demonstrated their concern for the entire student population of Pulaski County. (PX 22)

20. In response to Act 21 of the 1966 Legislature, all three districts appointed members to the Pulaski County School Study Commission to study consolidation. (PX 35) This commission prepared a plan for consolidation of all three districts. (PX 35) The Pulaski County Special School Dis-

trict adopted the Commission's recommendations. (PX 21) The North Little Rock School District discussed this issue on December 15, 1966 and held a hearing on the proposed consolidation on January 24, 1967. While the North Little Rock School District was considering consolidation, a desegregation suit was filed against that district. Consolidation efforts ceased.

21. Because of the large numbers of formal and informal transfers of students among the districts and the abetting of the transfers by the districts, the cooperation among the districts and their personnel in other areas, the recurrent consideration of consolidation and the long-standing practices of annexations to the two city districts, the Court finds that the three school districts in Pulaski County were not historically separate and autonomous.

22. The Pulaski County Special School District was interested in consolidation with the other districts in the county and was willing to have its territory annexed to the Little Rock (and North Little Rock) School District(s) until approximately the time when the Little Rock School District adopted an essentially full-scale desegregation plan. Since that time the Pulaski County district has not been willing to consolidate with the other districts or to allow its territory to be annexed to Little Rock or to North Little Rock.

23. It was only with the increasing development of white suburban housing within the boundaries of the Pulaski County Special School District and the institution of desegregation efforts directed at the defendant districts that the defendant districts developed separate autonomous attitudes about their districts vis-a-vis the Little Rock School District. The assumption of these separate identifiable autonomous attitudes sprang from impermissible racial motives.

24. Recent informal efforts by the Little Rock School District to achieve consolidation failed.

25. The refusal of the Pulaski County Special School District, with its long history of deannexations and support of consolidation, allow this court to infer that race is a factor in its decision to energetically oppose interdistrict relief.

26. The Pulaski County Special School District's acts of freezing its boundaries to discontinue the practice of allowing city and Little Rock School District boundaries to remain coterminous springs from an unconstitutional racial motive that has significant interdistrict effects on the Little Rock School District.

*Taxation and Housing*

27. The Pulaski County Special School District receives substantial revenues from tax monies generated from properties located within the boundaries of the City of Little Rock. (PX 47—$4,504,073) Additionally, the county has received approximately $1,332,000 in revenue from Act 9 industrial development bond issues let by the City of Little Rock. The Little Rock School District has received no revenues from these bond issues. (T. 547) The Pulaski County Special School District is financially dependent on its association with the City of Little Rock.

28. Public housing in Pulaski County has historically been the subject of racial segregation.

29. Ark.Stat.Ann. § 19–3004 authorizes city and county governments to operate housing authorities upon adoption of an appropriate enabling resolution. The Cities of Little Rock and North Little Rock have adopted such resolutions, but Pulaski County has never chosen to operate a housing authority. However, Ark.Stat.Ann. § 19–3003(g) permits city housing authorities (such as Little Rock and North Little Rock) to construct housing projects within ten miles of their corporate limits. Even though they possessed this power, no housing project has ever been constructed within the boundaries of the Pulaski County Special School District by either the Little Rock or North Little Rock housing authorities.

30. The development of the Granite Mountain project together with the Federal

Housing Administration's development of an all black subdivision adjacent to the project serves as a good example of the manner in which blacks have been located to the south and east in Little Rock. The impact on public education in the county from the Granite Mountain development is also apparent, for once again the Little Rock School District annexed and the Pulaski County Special School District willingly "de-annexed" this area.

31. During the early 1950's, the Little Rock Housing Authority was also engaged in several clearance projects through which housing units were razed. (T. 61) Areas of central Little Rock were the subject of selective clearance (T. 62) while black projects located north and west in Little Rock and closer to predominantly white neighborhoods were the subject of complete clearance.

32. The black residents of these two clearance areas were relocated to the black housing projects in the eastern parts of the city. (T. 65–66) White families who were relocated from the central Little Rock clearance area were relocated to the west, rather than to the eastern parts of the city. (T. 142–43)

33. The relocation of blacks from the western and northern parts of the city, and from areas where black housing was found adjacent to white housing, to the eastern parts of the city was done pursuant to a deliberate policy of the Little Rock Housing Authority and other governmental bodies to maintain residential racial segregation. (T. 59–60, 70–71)

34. There were other policies designed to concentrate blacks in the eastern and central parts of the city. Up until at least the 1960's, the real estate practices of "steering" and "redlining" were common in Little Rock. (T. 74–76) Steering is the practice of real estate agents' directing potential house purchasers to certain residential areas if they were white but to other areas if they were black. Redlining is the practice of not making mortgage loans, or making only a few loans, to whites who wish to purchase homes in black areas or to blacks who wish to purchase homes in white areas. (T. 74–75) Formal redlining, in the sense of lines actually being drawn on maps, did not occur to any significant extent in Little Rock because it was not necessary; because of the relatively small size of the city and because mortgage lending officers knew which areas were supposed to be black and which were supposed to be white, the loan officer could be relied upon to perpetuate residential segregation. (T. 75–76)

35. Mr. Andrew Jeffries, a black real estate broker, violated a policy of his employer by selling a home to a black in an area which had not previously been occupied by blacks. (T. 148) This same sale also violated an Arkansas Real Estate Commission regulation which provided that "a realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood." (PX 50–A, Article 34 of the Code of Ethics of the National Association of Real Estate Boards) Mr. Jeffries' sale was reported by his employer to the Arkansas Real Estate Commission whereupon he was advised that this "misconduct" might prevent him from receiving his real estate license. He did receive his license but was forced to resign his employment by his employer.

36. These housing practices, both public and private, together with the manner in which predominantly black areas were willingly transferred to the Little Rock School District from the Pulaski County Special School District contributed greatly to the disparity in the racial composition of these school districts.

37. The North Little Rock Urban Renewal and Housing Authority programs operated in a similar fashion to Little Rock's. The low-income housing projects in North Little Rock were all constructed south of Interstate 40, in the less-affluent portions of the city. The projects which were initially for white occupants, Windamere Hills and Silver City Courts, were located west

of Interstate 30 and south of Interstate 40, while black projects, Hemlock and Eastgate, were located east of Interstate 30 and south of Interstate 40. (PX 4)

38. The only major clearance project in North Little Rock was a complete clearance of the Military Heights area lying south of Interstate 40 and west of Interstate 30. This project had become all black and when it was razed, blacks were moved to Little Rock as well as south and east in North Little Rock.

39. A review of the minutes of the North Little Rock School Board reflects that decisions concerning school construction and renovation were made in a manner which considered and sought to preserve the racial identification of North Little Rock neighborhoods.

40. Some tracts purchased for school construction were subject to racially restrictive covenants. (PX 51) Such purchases necessarily were more beneficial to the white patrons of the North Little Rock School District than they were to its black patrons. Furthermore, this type of action would only serve to make the North Little Rock School District less attractive to current and prospective black residents of Pulaski County.

41. The goal of preserving residential segregation has been successful. The southern and eastern parts of the Little Rock School District remain heavily black to this day. The black population of the city has expanded to the west to some extent, but the far western portions of the city remain white today. (PX 5 and 40, p. 13) Northern and northwestern parts of the city, including the area where the black West Rock clearance area was formerly located, remain virtually all-white today. (PX 5 and 40, p. 13) Similarly in North Little Rock, the residential areas near the housing projects, that is, those lying south of Interstate 40, have become substantially black. The area north of Interstate 40 has remained overwhelmingly white. (PX 5)

42. The existence and location of the housing projects, the location of other government-subsidized housing units, the failure to build projects within the geographic boundaries of the county district, and the private and public steering and redlining practices are major contributing factors to the residential segregation in Pulaski County which exists today.

### The Expert Witnesses

43. Dr. Robert Dentler, a witness for plaintiff and Professor of Urban Sociology and Education at the University of Massachusetts and former Dean of Education at Boston University, analyzed the existing status of the three districts with reference to their achievement of a unitary, desegregated system. Dr. Dentler was one of the three court appointed experts in *Liddell v. Board of Education of the City of St. Louis, et al.*, No. 72–100C(4) (E.D.Mo.), which has been the subject of voluminous litigation in this Circuit and involves the consolidation of multiple districts in the St. Louis metropolitan area. He is widely recognized as an expert in school desegregation.

44. Dr. Dentler began with a data base which included but was not limited to the following: Student enrollments in the pertinent time period, description of facilities in each of the districts, the date facilities were constructed, types of repairs and renovations made on the facilities, the racial and ethnic composition of the student bodies of the three systems over a period of time, curricular and instructional program materials of each district, the location of housing projects and public assistance projects in Pulaski County, industrial development, and on-site visits to each of the three districts. This data base was submitted to the Court during the trial and all documents were available for inspection and cross-examination. Dentler further used demographic, educational and transportation facilities data gathered in the formal discovery process. (T. 328–30)

45. Dr. Dentler expanded his data base further by gathering substantial information from administrators at the Little Rock School District Central Office; the Director

of Management Information Services of the University of Arkansas, Mr. Jim Lynch; surveys and reports published by the University of Arkansas; and plans and officials of Metroplan, a countywide metropolitan planning agency of which all three of the districts involved in the case at bar are members. (T. 331–32)

46. Another expert witness for plaintiff was Dr. Charles Willie, Professor of Education and Urban Studies at the Harvard Graduate School of Education for the past nine years. Dr. Willie previously taught at New York University and Syracuse. Dr. Willie's areas of expertise are educational sociology, educational planning, educational administration and race relations, community organization and population demography. He has published extensively in each of these areas. Of significant relevance to. the instant case are "Community Organization and Educational Politics", "The Sociology of Urban Education", "Black Students at White Colleges", and "Race Ethnics, and Associated Economic Status" and a book currently in press outlining in detail the desegregation efforts in Atlanta, Milwaukee, Boston, and Seattle. (T. 179–80; PX 14) Dr. Willie has served as a court appointed master in the Boston school desegregation case, and as an expert witness in the Denver school desegregation case for the defendant school board. He was later appointed by the court to a compliance assistance panel in Denver. He was an expert witness for the plaintiff in the Dallas school desegregation case, and an expert witness for the United States Government in the North Carolina Higher Education desegregation case. (T. 180)

47. Dr. Willie was retained for the purpose of looking at the defendants, North Little Rock School District and the Pulaski County School District, to examine the court orders to desegregate the defendant districts, and to determine whether or not the actions of the defendant districts had complied with the court orders and whether or not the failure of those districts to comply with the orders of this District Court had interdistrict effects on the Little Rock School District. (T. 186)

48. The data base for his testimony consisted of census bureau reports having to do with social and economic characteristics of the cities and county in the metropolitan area, the metropolitan data book, the data obtained from various school systems through the discovery process and from reading of the court orders and opinions. (T. 187–90).

49. The other expert witness for the Little Rock School District was Dr. Martin Shapiro of Emory University who has a PhD from Indiana University and a J.D. from Emory University.

50. Dr. Shapiro has recently been involved in two school desegregation cases dealing primarily with the placement and testing of children in special education programs and with ability tracking. (T. 1031)

51. Dr. Shapiro's assignment here was to read and analyze magnetic tapes from the federal Office of Civil Rights of the Department of Education. These contain data gathered every year, more extensively in the even numbered years, and concern placement of children in special education programs. (T. 1031)

52. Dr. Finis Welch testified as an expert witness for the defendant Pulaski County Special School District. Dr. Welch is a professor of economics at UCLA. He also heads his own consulting firm, Welch Associates, which develops statistical information and provides expert statistical testimony for defendants for litigation. (T. 1352)

53. The other expert witness for the defendants was Dr. J. Michael Ross. He has a PhD from Harvard in Social Psychology and has taught at the University of California, Massachusetts Institute of Technology and Boston University. He has done research on school desegregation for 20 years and has served as a consultant in those fields.

54. As will appear in these findings, the Court has to a considerable extent accepted the findings and opinions of the plaintiff's experts and discounted those of defend-

ants' experts. The former are some of the most eminent authorities in the field of school desegregation. While the latter are distinguished scholars, I am not satisfied as to the validity of many of their premises and conclusions in this case.

### Status of Desegregation in the Little Rock School District

55. The Little Rock School Board, the Superintendent of Schools and the staff of the Little Rock School District have a dedicated and demonstrable commitment to the extirpation of segregation "root and branch" as evidenced by programs, policies and resource commitments. (T. 351, 1400–1403, 1427–1430)

56. The Little Rock School Board and staff are knowledgeable as to court orders mandating total integration. (T. 1321–22)

57. The Little Rock School District has complied with the directives establishing a Bi-Racial Committee for the District, as ordered by the Court. (T. 1319; PX 56) Further efforts to achieve desegregation resulted in a bi-racial committee at each school (T. 1319, 1404) and a student bi-racial committee.

58. In an effort to remedy disparity between blacks and whites on the nationwide SRA test, the Little Rock School Board adopted a policy to develop programs and expend resources to close the gap. Some of the programs implemented by the District have been: homework centers, hotlines, a kindergarten failure program and the Carver School. (T. 1331)

59. The school district has a master learning concept which is designed to assist teachers in becoming more sensitive to the needs of minority youngsters. (T. 1401–1403) The district has developed a Free Reading program which is aimed at reducing the difference in the reading levels between black and white students; it has instituted a tutoring program; it has opened study centers in areas which are easily accessible to minority students. (T. 1403)

60. In addition to having a staff which is sensitive and responsive to the desegregation process, the Little Rock School District utilizes auxiliary units or programs to assist in the integration process. (T. 141)

61. With regard to staffing, the Little Rock School District employs a desegregation officer whose title is Assistant to the Superintendent in Charge of Desegregation. However, his responsibilities in desegregation are shared with virtually all the other staff members in the administration. (T. 1401)

62. The Little Rock School District's conscious efforts regarding desegregation are further evidenced by the number of blacks and whites the district employs. (T. 1427–30) Currently, the percentage of black staff members (teachers, principals and administrators all included) is approximately 48%. (T. 1430; PX 26)

63. Educational programs in the Little Rock School District have observable consequences for the upgrading of black student achievement and retention rates in the Little Rock school system. (T. 352)

64. Conversely, the Pulaski County School System and the North Little Rock School System have no programs of this kind to provide compensatory or supportive assistance for blacks. (T. 352)

65. Further program inequities in the North Little Rock and the Pulaski County School Districts can be demonstrated in the major difference between the program and curricular guides. In the Little Rock School District, educational opportunity for black students figures in the agenda and the business of instruction in many ways that are absent in the other two systems. (T. 352)

66. The magnet factors of relatives, jobs, and public housing units have encouraged high proportions of blacks migrating to move to the Little Rock School District. (T. 225, 226)

### Status of Desegregation in the Pulaski County School District

67. The staff and Board of the Pulaski County School Board have displayed only

minimal knowledge of this court's mandates in *Zinnamon v. Pulaski County Special School District, supra,* which may partially account for substantial noncompliance with its terms. (T. 842–49)

68. The Pulaski County Special School District does not have any programs, policies, or practices to guarantee compliance with the court's order requiring that construction site selection be racially neutral. (T. 850–51)

69. In selecting new school construction sites, the Pulaski County Special School District Board has not complied with Paragraph 4(h) of the *Zinnamon* decree which required that new school site selection and school enlargement be determined on the basis of the objective criteria set out in *Swann v. Charlotte Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. In fact, the Board members are unfamiliar with this specific requirement, have never seen or read a copy of *Swann* or *Zinnamon* and have never been informed of the meaning of the "racially neutral" requirement set out in *Swann.* The selection of all sites for new schools built after the entry of the *Zinnamon* decree has been made without any consideration given to the impact or effect such selection would have on desegregation and is therefore a constitutional violation. As stated repeatedly during the testimony of the various board members, race has been completely ignored in school site selection. The racial characteristics of a proposed construction site *must* be taken into account by the Board in order for it to discharge its responsibilities under the *Zinnamon* decree:

> The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of innercity neighborhoods.
>
> In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown,* closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races.

402 U.S. at 20–21, 91 S.Ct. at 1278.

70. The Pulaski County Special School District staff member in charge of school construction planning also testified repeatedly that race played no part in site selection. (T. 833–34, 837, 841) He had not heard of the term "racially neutral site," and knew nothing about the *Zinnamon* decree. (T. 834)

71. The building of new schools that are racially indentifiable, even to the point of being in excess of 90% white, indicates that the school district is ignoring or rejecting

the court orders to desegregate. (T. 229, 230; PCSSD X 9)

72. Through its power of annexation, the City of Little Rock has played an instrumental role in the site selection of new schools constructed in the Pulaski County Special School District. This has been particularly true as to Otter Creek Elementary School and Fair High School where the City has provided the necessary city services to facilitate the location of these schools in predominately white areas. This will inevitably spur more white movement out of the Little Rock School District to the Pulaski County Special School District. (T. 1204–1208; 838–840)

73. Due to the aggressive annexation practice of the City of Little Rock, the population of the unincorporated portions of Pulaski County had decreased between 1970 and 1980 by one-half, while the white population of the Pulaski County Special School District was holding steady or even increasing. (T. 218) At the same time the white population in the North Little Rock School District and the Little Rock School District diminished. (T. 218)

74. In Pulaski County, outside the boundaries of Little Rock and North Little Rock, the per capita median income is lower, as is pupil expenditure. There was thus no economic basis for the movement to Pulaski County and it therefore was probably racially motivated. (T. 219)

75. The defendant Pulaski County Special School District's Exhibit 13 confirmed Dr. Willie's theory that the movement of whites is related to the size of the black and minority population in that school system by showing that a disproportionate number of whites were moving into the Pulaski County Special School District. (T. 223, 224)

76. Fewer employment opportunities for blacks, absence of role models in teaching and administration, deployment of students, and total absence of blacks at levels of decision making are all factors which discourage minorities from moving to Pulaski County Special School District because there is no indication that they will be treated fairly or with openness and inclusiveness. (T. 227)

77. The future plans of the City of Little Rock include carrying forth an assertive annexation plan designed to bring virtually all of Pulaski County south of the river within the limits of the city. (T. 1219–1220) The annexation and resulting availability of services in these outlying areas will provide the impetus for population growth in these areas (T. 1209), further increasing the tendency toward white flight to the suburbs. (T. 1209)

78. In developing attendance zones for the Pulaski County School District, the staff and Board did not follow the mandate of the *Zinnamon* decree. Admittedly this was difficult in view of the site selection policies. These zones were formulated without the requisite professional, legal, and expert assistance. As a result over 50% of the schools are not in compliance with paragraph 4(e) of the *Zinnamon* decree requiring black enrollment of "not less than ten or not more than twenty-five per cent." (T. 630–36; 697–724; 856–58)

79. The County Board Members were unaware of the Pulaski County Special School District's obligation to establish a Bi-Racial Committee as set out in Paragraph 4(k) of the *Zinnamon* decree, and unaware of any effort undertaken by Pulaski County Special School District to establish such a committee. (T. 585, 586, 587, 629, 689, 875–77) The absence of a bi-racial council in Pulaski County Special School District is a serious violation of the court order. (T. 216)

80. The Pulaski County Special School District Board has never complied with Paragraph 4(1) of the *Zinnamon* decree requiring that two black citizens, elected and selected by the black community, serve in an ex-officio capacity on its Board of Education. (T. 587, 588, 589, 629, 878) Ex-officio Board members who sit and participate in all deliberations, although they may not vote, are even more important than bi-racial committees. (T. 217) Failure to

designate such members is also a serious violation of the court order.

81. The Pulaski County Special School District has never had a black in a top level administrative position. (T. 865–868)

82. The Pulaski County Special School District has never instituted or implemented any policy, practice, or procedure as required under the *Zinnamon* decree to encourage principals and other responsible administrators to structure curricular or extracurricular activities to insure the participation of a proportionate number of blacks. (T. 871)

83. The Pulaski County Special School District has no mechanism to monitor the percentage of blacks and whites in the school's Talented and Gifted (TAG) program, the Educably Mentally Retarded (EMR) program, or the Learning Disabled (LD) program. (T. 871–72; 894)

84. Blacks are underrepresented in the administrative offices of the Pulaski County Special School District and also on the teaching faculty of schools in the district (T. 203–204, 208)

85. Only 2,196 students in Pulaski County Special School District are bused for purposes of desegregation. In a district which is 23% black, 56% of the 2,196 students bused for desegregation purposes are black. (T. 346)

86. A black student enrolled in the Pulaski County Special School District System is 2½ times more likely to be bused for desegregation purposes than a white student. (T. 346)

87. Defendant's Exhibit No. 10, entitled Pulaski County School District School Enrollment from Neighborhood and Satellite Zones, together with transportation summary makes it clear that disproportionate numbers of blacks are transported and that some blacks are transported long distances just to go to a school which is already racially identifiable as black.

88. These transportation figures are not surprising when considered in light of the site selection practices of the Pulaski County Special School District.

89. It is clear that the Pulaski County Special School District maintains identifiably black schools by simply refusing to bus in whites or by busing in additional blacks. Examples of schools maintained identifiably black by busing in blacks include Wakefield, Watson and Cloverdale. (T. 346)

90. In contrast, the identifiably white schools, Baker, Bayou Meto, Cato, Oak Grove, and Fair are maintained as white schools because blacks are not bused to them. Busing is used for desegregative purposes in Pulaski County only at Harris, Mills and Fuller schools and not sufficiently in those to bring those schools out of their identifiably black status. (T. 347)

### Status of Desegregation in the North Little Rock School District

91. Blacks are underrepresented on the administrative staff and on the teaching faculties of the schools in the North Little Rock School District. (T. 1182; 191) The North Little Rock School District is required by court order to desegregate its staff so that the proportion of its staff will be similar to that of the students enrolled in the system. The percent of principals found in the North Little Rock system is 16 percentage points less than the proportion of black students. (T. 191) The faculty of the North Little Rock School District is 22% black and 78% white. Since there is a 34% to 35% minority school population, growing at ½% to 2% per year, the proportion of minority teachers is violative of the court order. (T. 191)

92. Whites are underrepresented in schools south of Interstate 40. (T. 195) Blacks are underrepresented in schools north of Interstate 40. Thus, blacks are concentrated in schools in the southern part of North Little Rock closest to Little Rock and whites are concentrated in schools in the northern part of the district.

93. The North Little Rock School District has failed to become a unitary district by its failure to have blacks at the central administration, concentrating whites in

schools north of Interstate 40 while concentrating blacks in schools south of Interstate 40, its failure to have black principals and administrators at the high school level, and its failure to have blacks coaching at the senior high school level.

94. Twenty percent of the black student body is classified as mentally retarded or as having learning disabilities. (T. 1183) This unusual statistic was analyzed by Dr. Martin Shapiro.

95. PX 27 is a voluminous set of three printouts assembled by Dr. Martin Shapiro. The first set is the actual raw data, the second set summarizes the data in terms of classroom assignments, and the third, analyzes the placement of children with respect to the Educable Mentally Retarded (EMR) and Specific Learning Disabled (SLD) categories. (T. 1033) Dr. Shapiro made findings and reports for the years 1972, 1976, 1978 and 1980. (T. 1034; PX 63)

96. The data Dr. Shapiro reviewed included the number of expulsions, corporal punishments, and suspensions by race; the subject matter and grade level of each class; the number of EMR seriously emotionally disturbed, trainable mentally retarded, and SLD by race; and number of diplomas by race. (T. 1036–1038)

97. Dr. Shapiro developed a statistical methodology which allows for inferential statistical techniques, stating conclusions in terms of standard deviations. The Court approves of this methodology. (T. 1039) Shapiro's method is described fully in PX 63–H. (T. 1039) Shapiro's analysis resulted in a statistical index showing the disproportionality of blacks and whites between schools in a district and within schools. (T. 1040, 1041)

98. In each instance his analysis used standard statistical methods of standard deviations and chi squares, and their associated probabilities. (T. 1046)

99. Blacks in all three of the districts are overrepresented in special education (T. 1049), with there being a serious overrepresentation of blacks in the EMR category in North Little Rock and a very high one in the Pulaski County Special School District. (T. 1050) The results in these two systems are extreme compared to other systems which Shapiro has analyzed. (T. 1052) No valid testing procedure could end up placing one out of every four or five children in special education (T. 1084)

100. The gifted program in North Little Rock for 1980 reflects that only 9.4% of the program was black. This is an underrepresentation of blacks in the gifted program of 6.8 standard deviations, which would occur only seven times in a billion by chance. (T. 1062)

101. In 1980, 5.66% of blacks in the Little Rock School District were classified as retarded or learning disabled, 19.41% of blacks in North Little Rock were so classified, and 11.40% in Pulaski County Special School District were so classified. Said another way, a black student moving from the Little Rock School District to Pulaski County Special School District doubles his risk of receiving a retarded or learning disabled classification, while the risk is quadrupled if a black moves from the Little Rock School District to the North Little Rock School District. (T. 1067)

102. Analysis of Exhibit 63–G reveals that blacks are overrepresented in dropout rate and expulsions in all of the districts except in the Little Rock School District. (T. 1069)

*Interdistrict Effects Policies and Practices of the Three Districts*

103. After review and investigation of each of the districts and the findings herein, a determination was made of the interdistrict effects of the racial isolation between and among the districts. The Court is in agreement with Dr. Dentler as to the following interdistrict effects:

(1) Interdistrict effects for educational programs.

(a) Black students in Little Rock and North Little Rock are denied access to the very predominantly white enrolled programs for gifted and talented students lo-

cated in the Pulaski County Special School District. (T. 372)

(b) Conversely, black students in North Little Rock and the Pulaski County Special School District are denied access to the only magnet schools that operate in the County; these schools are accessible only to students in the Little Rock School District, with the single exception of the Metropolitan Vocational Technical school, which is located outside of the Little Rock School District but is operated by it on behalf of all three districts. (T. 372)

(c) Black students in Little Rock receive strong compensatory instructional support. Little Rock School District resources and resources sought from the state and federal governments have been aimed at upgrading the learning opportunities of black students in Little Rock particularly during the last 5 years. (T. 372) Neither the North Little Rock School District nor the Pulaski County Special School District provide comparable compensatory instructional support for black students. (T. 372)

(d) Before the Supreme Court decision in *Brown v. Board of Education,* there were many totally segregated schools. During the next 25 years, however, schools for black students disappeared. These schools were replaced by institutions that were allegedly designed to serve students with special needs; known as exceptional schools, they were predominantly black. (T. 374) The next phase of development involved the concept of mainstreaming under which school districts were obligated to give students with special needs access to regular schooling. (T. 374) Nonetheless some districts reflect a heritage of racial discrimination by placing black students in segregated special education programs. (T. 374) In both the Pulaski County Special School District and North Little Rock School District white students are classified as students with "learning disabilities," while blacks in those districts are labeled as "mentally retarded." (T. 375)

(e) Classification of black students into one category or another for special education treatment differs according to the school district residence of the black student. (T. 373)

(f) The chances that a black student will be classified as educably mentally retarded statistically are significantly much greater in the North Little Rock School District and the Pulaski County Special School District than they are in the Little Rock School District. (T. 373)

(g) The North Little Rock and Pulaski County School districts emphasize learning disability programs which host predominantly white students, while black students in those districts are hosted in special education classes for alleged mental retardation. (T. 373)

(2) Interdistrict effects in area staffing:

(a) The three districts in Pulaski County hinder one another with respect to achieving racial and educational equity in staffing. (T. 375) Blacks have a greater chance of becoming school administrators in the Little Rock School District than they do in either the North Little Rock School District or the Pulaski County Special School District. (T. 375)

(b) The chances of a black teacher being hired are 1½ times greater in the Little Rock School District than they are in either the Pulaski County Special School District or the North Little Rock School District. (T. 376)

(3) Interdistrict effect of student distribution among the districts.

(a) The interdistrict consequences of student assignments, student transportation and facility provisions result in a situation which makes black students and their families more attracted to the Little Rock School District than to either the North Little Rock School District or the Pulaski County Special School District. (T. 377)

(4) Interdistrict effects created by all three districts operating under separate and independent court orders to desegregate.

(a) Each of these court orders to desegregate was drawn up as an occasional patch in a patchwork quilt, without regard

to the consequences or implications for the other school districts in Pulaski County. (T. 377)

(b) The magnet schools in use in Little Rock are not workable on a single-district basis within a metropolitan area. Magnet schools cannot have educational success when some students can enter and others cannot. (T. 378)

(5) The separate transportation plans and programs of the three districts have interdistrict effects.

(a) Busing designed for desegregative purposes has resulted in a greater percentage of black students being bused in the North Little Rock School District and the Pulaski County Special School District than should be expected with less than satisfactory desegregation results. (T. 379)

(6) The boundary lines themselves have interdistrict effects.

(a) The boundary lines are maintained to keep the Little Rock School District predominantly black and limit opportunities therein for black students. (T. 379)

(b) The boundaries have generated consequences with respect to difference in state aid for instructional and related services and state aid for transportation. (T. 380)

(c) While the differences which favored the county over the years were remedied in the 1983 special legislative session, the effects continue from all the years in which the state aid formula supported the county and was a disadvantage to the Little Rock School District and the North Little Rock School District. (T. 380)

(d) The boundary conditions as they exist led to a system that allows school construction to follow real estate development and not educational needs or constitutional mandates. (T. 380)

(e) The boundary lines cause the overcrowding of students, particularly black students, in some schools and produce empty seats in others. (T. 381)

104. Dr. Willie agreed with the above conclusions of Dr. Dentler that these acts impacted on the Little Rock School District and contributed to the interdistrict effect of a disproportionate concentration of blacks in the Little Rock School District. (T. 228)

105. The disparity between the districts in the classification of black students into the special ed categories has an interdistrict effect. Blacks are discouraged from moving out of the Little Rock School District by this disparity.

## III.

## SUMMARY

The Little Rock School District in spite of good faith efforts to comply with orders of this court and to establish a unitary school system will become a segregated all-black district in a few years if present trends continue, which appears highly likely.

The Pulaski County Special School District has failed to comply with the mandates of this court delivered in 1973 to establish a unified, integrated system. Such non-compliance by the Board and staff is so substantial that the Pulaski County district is not now operating a constitutional school system.

The North Little Rock School District has also failed to establish a unitary, integrated district for the reasons noted in the above findings and in the observations of the Court of Appeals quoted at some length, *supra*. There is minimal integration in the administrative staff and there is blatant discrimination in the classification of students into mental retardation and slow learning categories.

The deficiencies in the Pulaski County and North Little Rock districts have had severe interdistrict effects, as noted in the findings, *supra*. The only long-term or even short-term solution to these problems is consolidation. Not only will this solution provide the basis for establishment of a unitary school system, but it should provide economy in administration and transportation that will contribute toward a quality education for all students in this county. Financial support for the schools,

which shows signs of waning particularly in Little Rock, can be equalized and stabilized. It is obvious from the last school election that Little Rock whites, many of whom are educating their children in private schools, are unwilling to commit financial support to a school system rapidly becoming all black. The same trends so evident in Little Rock are now beginning to gather momentum in North Little Rock. North Little Rock now is approximately at the point where Little Rock was ten years ago in terms of black enrollment.

The collapse of support for public education would be a tragic event. It is axiomatic that a democracy cannot long exist without a system of free public schools providing a quality education. In my view public education in this community has reached a crisis stage. The problem cannot be avoided by equivocation or half measures. I am today ordering a consolidating of the three school districts now operating in Pulaski County. Consolidation is feasible, workable, and in the best interests of all students in Pulaski County. The precise nature of the means to accomplish such a consolidation plan will be examined at a hearing on April 30, 1984.

## IV.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter of this action under 28 U.S.C. §§ 1331(a), 1343(3) and (4), 2201, and 2202. Plaintiff alleges that its cause of action arises under 42 U.S.C. §§ 1981, 1983, 1988 and 2000d, and the Fourteenth Amendment of the Constitution of the United States.

2. None of the three school districts in this case has achieved unitary status. *Cf. United States v. Texas Education Agency,* 647 F.2d 504 (5th Cir.1981). The Pulaski County Special School District has never applied for unitary status; the North Little Rock District and the Little Rock District have applied for but been denied unitary status. *Clark v. Board of Education,* 705 F.2d 265 (8th Cir.1983); *Davis v. Board of Education,* 674 F.2d 684 (8th Cir.1982).

3. The well established history of de jure segregation together with judgments and orders of the United States District Court for the Eastern District of Arkansas, place upon each of the Districts in the instant case the affirmative duty to eliminate every vestige of the state-mandated system of segregation. *Swann v. Charlotte Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Liddell v. State of Missouri,* 731 F.2d 1294, 1306, (8th Cir., 1984), at n. 10.

4. The history of interdistrict transfers, ignoring of boundary lines, pattern of annexations, the interdependence of all parts of the metropolitan area, the county as the basic taxing and collecting unit, the history of cooperation among the districts, and the County Board of Education's supervisory role for the three school districts demonstrate that the three districts historically had fluid boundary lines and were not meaningfully separate or autonomous. *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del. 1975) (three-judge court).

5. The Little Rock School District has standing to bring this suit in furtherance of its affirmative duty to eliminate all vestiges of segregation root and branch, and in compliance with prior orders of this Court to provide a desegregated education for its students. *Swann v. Charlotte Mecklenburg Board of Education, supra; Clark v. Board of Education, supra.* In addition, voluntary efforts to achieve interdistrict relief have failed.

6. The predominantly segregated residential patterns of Pulaski County have been caused in a significant degree by the actions of many governmental bodies, acting in concert with each other, with the defendants, and with private interests, and are not solely attributable to a series of individualized private housing choices. *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1975); *Swann v. Charlotte Mecklenburg Board of Education, supra.*

7. The governmental actions affecting housing patterns in Pulaski County have had a significant interdistrict effect on the schools in Pulaski County, which has resulted in the great disparity in the racial composition of the student bodies of the Little Rock district and the two defendants districts. *Swann v. Charlotte Mecklenburg Board of Education, supra.*

8. The segregative actions taken by the two defendant districts and their failure to take desegregative actions have had a significant interdistrict effect on the schools in Pulaski County, which has also contributed to the great disparity in the racial composition of the student bodies of the Little Rock district and the two defendant districts. *Swann v. Charlotte Mecklenburg Board of Education, supra.*

9. The Pulaski County Special School District has committed the following purposeful acts with continuing racially segregative interdistrict effects: (a) failed to adhere to the requirements of the *Zinnamon* decree; (b) constructed schools in locations which ensured that they would be racially identifiable schools; (c) failed to apportion the burdens of transportation equally on black and white students; (d) refused to hire and promote black faculty and staff; (e) refused to allow deannexation to or consolidation with the other two districts; (f) failed to assign students to schools in such a way as to maximize desegregation; (g) assigned students to special education classifications and gifted programs on a discriminatory basis; (h) assigned black principals to schools with high black enrollments; (i) created and maintained a racial imbalance in almost half its schools; and (j) closed and downgraded schools in black neighborhoods and failed to build new schools there.

10. The North Little Rock School District has committed the following purposeful acts with continuing racially segregative interdistrict effects: (a) failed to assign blacks to its central administration or to high school principalships and coaching positions; (b) concentrated whites in schools north of Interstate 40 and blacks in schools south of it; (c) assigned students to special education classifications on a discriminatory basis; and (d) failed to apportion the burdens of transportation equally on black and white students.

11. When Pulaski County Special School District and North Little Rock School District took the purposeful acts set forth in Conclusion Nos. 9 and 10 above, they knew or should have known that they would have interdistrict segregative effects.

12. The unconstitutional and racially discriminatory acts of the Pulaski County and North Little Rock School Districts have resulted in significant and substantial interdistrict segregation. *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069.

13. Since there are constitutional violations with interdistrict effects, an interdistrict remedy is appropriate. *Milliken v. Bradley, supra; Liddell v. State of Missouri, supra.* The remedial hearing will begin April 30, 1984.

14. The Pulaski County Board of Education and Arkansas State Board of Education are necessary parties who must be made subject to the Court's remedial order.

EXHIBIT 1

Table 8. ELEMENTARY SCHOOLS: FACILITIES, ENROLLMENTS, AND STAFF

| NAME | YEAR BLT.* | CON- DI- TION | GRADES | CAPA- CITY ** | 1982 ENRLMT. | % UTIL- IZATION | BLACK ENRLMT. | % BL. | 1983 TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Little Rock | | | | | | | | | | | | |
| 1) Brady | '54 | 3 | K–3 | 525 | 340 | 65 | 266 | 78 | 20.7 | 4.6 | 1 | 0 |
| 2) Fair Park | '29 | 2 | K–3 | 325 | 304 | 94 | 240 | 79 | 19.1 | 12.1 | 1 | 1 |
| 3) Forest Park | '13 | 2 | K–3 | 475 | 345 | 73 | 210 | 61 | 19.8 | 6.0 | 1 | 1 |
| 4) Fullbright | '79 | 1 | K–3 | 625 | 480 | 77 | 369 | 77 | 25.8 | 6.0 | 1 | 0 |
| 5) Jefferson | '50 | 3 | K–3 | 500 | 357 | 71 | 233 | 65 | 23.4 | 6.0 | 1 | 0 |
| 6) McDermott | '67 | 2 | K–3 | 600 | 432 | 72 | 330 | 76 | 24.6 | 8.6 | 1 | 0 |
| 7) Meadowcliff | '56 | 2 | K–3 | 500 | 413 | 83 | 301 | 73 | 24.2 | 9.5 | 1 | 0 |
| 8) Terry | '64 | 2 | K–3 | 600 | 521 | 87 | 345 | 66 | 28.8 | 5.0 | 1 | 0 |
| 9) Woodruff | '11 | 1 | K–3 | 325 | 258 | 79 | 189 | 73 | 17.4 | 5.4 | 1 | 0 |

| NAME | YEAR BLT.* | CON-DI-TION | GRADES | CAPA-CITY** | 1982 ENRLMT. | % UTIL-IZATION | BLACK ENRLMT | % BL. | 1983 TCHRS | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Little Rock | | | | | | | | | | | | |
| 10) Bale | '59 | 3 | K–3 | 500 | 380 | 67 | 226 | 68 | 19.9 | 7.8 | 1 | 1 |
| 11) Carver | '24 | 3 | K–6 | 480 | 495 | 104 | 495 | 100 | 27.7 | 15.0 | 1 | 1 |
| 12) Ish | '64 | 2 | K–6 | 400 | 397 | 99 | 397 | 100 | 24.3 | 8.0 | 1 | 0 |
| 13) Mitchell | '08 | 2 | K–6 | 275 | 396 | 144 | 396 | 100 | 23.6 | 8.8 | 1 | 0 |
| 14) King | '37 | 2 | K–6 | 300 | 377 | 126 | 299 | 79 | 22.1 | 8.0 | 1 | 1 |
| 15) Rightsell | '06 | 3 | K–6 | 400 | 348 | 87 | 323 | 93 | 21.6 | 10.0 | 1 | 0 |
| 16) Romine | '61 | 2 | K–6 | 650 | 659 | 101 | 492 | 75 | 32.5 | 17.5 | 1 | 0 |
| 17) Western Hls. | '66 | 3 | K–6 | 225 | 315 | 140 | 151 | 48 | 16.0 | 5.0 | 1 | 0 |
| 18) Williams | '58 | 2 | K–6 | 550 | 452 | 82 | 212 | 47 | 28.4 | 11.0 | 1 | 1 |
| 19) Wilson | '27 | 2 | K–6 | 500 | 470 | 94 | 275 | 59 | 26.3 | 9.0 | 1 | 0 |
| Total: | | | | 8,755 | 7,689 | 88% | 5,749 | 75% | 446.2 | 163.3 | 19 | 6 |

\* Dates of additions to base plant not shown.

\*\* Portable classrooms <u>not</u> included in capacity count.

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY | 1982 ENRLMT. | % UTIL-IZATION | BLACK ENRLMT | % BL. | 1983 TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Little Rock Intermediate Elementary Schools | | | | | | | | | | | | |
| 20) Booker | '63 | 2 | 4–6 | 645 | 411 | 64 | 342 | 83 | 20.5 | 10.5 | 1 | 1 |
| 21) Franklin | '49 | 3 | 4–6 | 550 | 465 | 85 | 347 | 75 | 22.5 | 7.0 | 1 | 0 |
| 22) Garland | '22 | 3 | 4–6 | 380 | 384 | 101 | 318 | 83 | 20.0 | 14.5 | 1 | 0 |
| 23) Gibbs | '53 | 3 | 4–6 | 375 | 419 | 111 | 364 | 87 | 22.0 | 13.5 | 1 | 1 |
| 24) Pulaski Hts. | '25 | 3 | 4–6 | 500 | 427 | 85 | 263 | 62 | 21.5 | 6.0 | 1 | 0 |
| 25) Rockefeller | '79 | 1 | 4–6 | 500 | 402 | 80 | 288 | 72 | 23.5 | 9.5 | 1 | 0 |
| 26) Stephens | '50 | 2 | 4–6 | 425 | 341 | 80 | 233 | 68 | 18.5 | 8.5 | 1 | 0 |
| 27) Washington | '50 | 3 | 4–6 | 375 | 307 | 82 | 217 | 71 | 17.5 | 8.5 | 1 | 0 |
| Total: | | | | 3,750 | 3,156 | 84% | 2,372 | 75% | 166.0 | 78.0 | 8 | 3 |

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY * | 1982 ENRLMT. | % UTIL-ZATN. | BLACK ** ENRLMT. | % BL. | # TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADM. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Little Rock | | | | | | | | | | | | |
| 28) Amboy | | | K–6 | 370 | 288 | 78 | 67 | 23 | 24.5 | 5.0 | 1 | 0 |
| 29) Argenta | | | K–6 | 400 | 224 | 56 | 71 | 32 | 19.5 | 5.0 | 1 | 0 |
| 30) Belwood | | | K–6 | 250 | 153 | 61 | 31 | 20 | 15.5 | 3.0 | 1 | 0 |
| 31) Boone Pk. | | | K–6 | 565 | 565 | 100 | 222 | 39 | 34.5 | 9.5 | 1 | 0 |
| 32) Crestwood | | | K–6 | 300 | 211 | 70 | 87 | 41 | 18.5 | 3.5 | 1 | 0 |
| 33) Glenview | | | K–6 | 300 | 185 | 62 | 95 | 51 | 18.5 | 3.0 | 1 | 0 |
| 34) Indian Hls. | | | K–6 | 470 | 434 | 92 | 92 | 21 | 27.0 | 6.5 | 1 | 0 |
| 35) Lakewood | | | K–6 | 500 | 268 | 54 | 107 | 40 | 20.0 | 6.0 | 1 | 1 |
| 36) Levy | | | K–6 | 600 | 229 | 38 | 82 | 36 | 16.0 | 5.0 | 1 | 0 |
| 37) Lynch Dr. | | | K–6 | 400 | 345 | 86 | 130 | 38 | 26.0 | 5.5 | 1 | 0 |
| 38) Meadow Pk. | | | K–6 | 300 | 268 | 89 | 109 | 41 | 20.0 | 4.0 | 1 | 0 |
| 39) No. Heights | | | K–6 | 500 | 434 | 87 | 156 | 36 | 23.5 | 7.0 | 1 | 0 |
| 40) Park Hill | | | K–6 | 550 | 241 | 44 | 90 | 37 | 22.0 | 3.5 | 1 | 0 |
| 41) Pike View | | | K–6 | 350 | 334 | 90 | 86 | 26 | 26.0 | 4.5 | 1 | 0 |
| 42) Pine | | | K–6 | 400 | 265 | 66 | 136 | 51 | 19.5 | 4.5 | 1 | 0 |
| 43) Redwood | | | K–6 | 550 | 232 | 42 | 112 | 48 | 19.0 | 6.5 | 1 | 1 |
| 44) Rose City | | | K–6 | 650 | 285 | 44 | 70 | 25 | 23.0 | 4.5 | 1 | 0 |
| 45) Seventh St. | | | K–6 | 450 | 372 | 83 | 164 | 44 | 25.5 | 5.5 | 1 | 0 |
| Total: | | | | 7,905 | 5,333 | 67% | 1,907 | 36% | 398.5 | 92.0 | 18 | 2 |

\* Data not directly available. Estimated from 1954–1980 record of enrollments, using highest year, rounded.

\*\* Data not directly available on kindergarten students. Also, district does not distinguish black from other minority students in records. Estimates made by interpolating from two reports.

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY | 1982 ENRLMT. | % UTIL-IZATION | BLACK ENRLMT. | % BL. | # TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pulaski County | | | | | | | | | | | | |
| 46) Adkins | '63 | 3 | K–6 | 300 | 347 | 116 | 113 | 33 | 15.0 | 0.0 | 1 | 0 |
| 47) Arnold | NA | NA | K–6 | 500 | 491 | 98 | 93 | 19 | 18.0 | 4.0 | 1 | 0 |
| 48) Badgett | '63 | 2 | K–6 | 350 | 352 | 101 | 185 | 53 | 16.0 | 5.0 | 1 | 0 |
| 49) Baker | '59 | 2 | K–6 | 300 | 280 | 93 | 4 | 1 | 13.0 | 6.0 | 1 | 0 |
| 50) Baseline | '75 | 2 | K–6 | 500 | 583 | 117 | 285 | 49 | 27.0 | 5.0 | 1 | 0 |
| 51) Bayne Meto | '67 | 3 | K–6 | 400 | 615 | 154 | 10 | 2 | 24.0 | 3.0 | 1 | 0 |
| 52) Cato | '74 | 2 | K–6 | 600 | 606 | 101 | 15 | 3 | 28.0 | 6.0 | 1 | 0 |
| 53) Chicot | '75 | 2 | K–6 | 650 | 664 | 102 | 215 | 32 | 28.0 | 6.0 | 1 | 0 |
| 54) Cloverdale | '60 | 3 | K–6 | 500 | 572 | 114 | 192 | 36 | 25.0 | 4.0 | 1 | 0 |
| 55) Coll. Stn. | '59 | 2 | K | 375 | 116 | 31 | 93 | 80 | 6.5 | 2.0 | 1 | 1 |

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY | 1982 ENRLMT. | % UTIL-IZATION | BLACK ENRLMT. | % BL. | = TCHRS. | = BL. TCHRS. | = ADMRS. | = B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pulaski County** | | | | | | | | | | | | |
| 56) Cook | '54 | 2 | K | 350 | 223 | 64 | 122 | 55 | 13.5 | 4.5 | 1 | 1 |
| 57) Dodd | '61 | 2 | K–6 | 375 | 340 | 91 | 91 | 27 | 15.0 | 3.0 | 1 | 0 |
| 58) Dupree | '59 | 2 | K–6 | 450 | 454 | 101 | 69 | 15 | 18.0 | 4.0 | 1 | 0 |
| 59) Fuller | '59 | 2 | K–6 | 400 | 485 | 121 | 167 | 34 | 21.0 | 5.0 | 1 | 0 |
| 60) Geyer Spr. | '59 | 2 | K–6 | 200 | 222 | 111 | 75 | 34 | 10.0 | 1.0 | 1 | 0 |
| 61) Harris | '55 | 2 | K–6 | 1,125 | 600 | 53 | 203 | 34 | 27.5 | 7.0 | 1 | 1 |
| 62) Jacksnvle. | '63 | 2 | K–6 | 775 | 734 | 95 | 162 | 22 | 30.0 | 6.0 | 1 | 0 |
| 63) Landmark | '59 | 2 | K–6 | 450 | 517 | 115 | 125 | 24 | 21.0 | 5.0 | 1 | 0 |
| 64) Lawson | '57 | 3 | K–6 | 350 | 386 | 110 | 4 | 1 | 19.5 | 4.5 | 1 | 0 |
| 65) Mabelvale | '58 | 2 | K–6 | 550 | 601 | 109 | 141 | 22 | 26.0 | 5.0 | 1 | 0 |
| 66) Oakbrooke | '80 | 1 | K–6 | 500 | 491 | 98 | 92 | 19 | 22.0 | 5.0 | 1 | 0 |
| 67) Oak Grove | '71 | 2 | K–6 | 725 | 565 | 78 | 59 | 10 | 23.0 | 5.0 | 1 | 0 |
| 68) Otter Creek | '79 | 1 | K–6 | 500 | 444 | 89 | 70 | 16 | 20.0 | 4.0 | 1 | 0 |
| 69) Pine Forest | '80 | 1 | K–6 | 500 | 528 | 106 | 62 | 12 | 23.0 | 4.0 | 1 | 0 |
| 70) Pinewood | '74 | 2 | K–6 | 500 | 547 | 109 | 128 | 23 | 23.0 | 8.0 | 1 | 1 |
| 71) Robinson | '74 | 2 | K–6 | 500 | 477 | 95 | 94 | 20 | 20.0 | 5.0 | 1 | 0 |
| 72) Scott | '30 | 1 | K–8 | 525 | 214 | 41 | 98 | 46 | 18.5 | 4.0 | 1 | 0 |
| 73) Sherwood | '60 | 2 | K–6 | 610 | 674 | 110 | 150 | 22 | 27.0 | 6.0 | 1 | 0 |
| 74) Sylvan Hls. | '63 | 2 | K–6 | 750 | 780 | 104 | 121 | 16 | 33.5 | 6.5 | 1 | 0 |
| 75) Taylor | '80 | 1 | K–6 | 500 | 463 | 93 | 110 | 24 | 20.0 | 4.0 | 1 | 0 |
| 76) Tolleson | NA | NA | K–6 | 700 | 585 | 83 | 91 | 16 | 23.5 | 5.0 | 1 | 1 |
| 77) Wakefield | '59 | 3 | K–6 | 575 | 512 | 89 | 170 | 33 | 20.0 | 6.0 | 1 | 1 |
| 78) Watson | '67 | 2 | K–6 | 600 | 560 | 93 | 234 | 42 | 27.0 | 5.0 | 1 | 0 |
| **Total:** | | | | 16,985 | 16,028 | 94% | 3,843 | 24% | 702.5 | 149.5 | 33 | 6 |

EXHIBIT 2

Table 9. JUNIOR HIGH SCHOOLS: FACILITIES, ENROLLMENTS, AND STAFF

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY | 1982 ENRLMT. | % UTIL-ZATN. | BLACK ENRLMT. | % BL. | 1983 TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Little Rock** | | | | | | | | | | | | |
| 79) Dunbar | '29 | 2 | 7–9 | 870 | 692 | 80 | 375 | 54 | 35.0 | 18.5 | 3 | 2 |
| 80) Forest Hls. | '56 | 3 | 7–9 | 725 | 769 | 106 | 502 | 65 | 40.0 | 17.0 | 3 | 1 |
| 81) Henderson | '64 | 2 | 7–9 | 955 | 862 | 90 | 494 | 57 | 50.0 | 14.0 | 3 | 1 |
| 82) Mann | '55 | 3 | 7–9 | 661 | 654 | 99 | 501 | 77 | 39.5 | 19.5 | 3 | 2 |
| 83) Pulaski Hts. | '21 | 2 | 7–9 | 700 | 600 | 86 | 360 | 60 | 34.0 | 9.0 | 3 | 1 |
| 84) Southwest | '56 | 3 | 7–9 | 765 | 710 | 93 | 467 | 66 | 38.0 | 15.5 | 3 | 1 |
| **Total:** | | | | 4,676 | 4,287 | 92% | 2,699 | 63% | 236.5 | 93.5 | 18 | 8 |
| **North Little Rock** | | | | | | | | | | | | |
| 85) Central | NA | NA | 7 | 1,000 | 812 | 81 | 231 | 28 | 54.0 | 9.5 | 2 | 0 |
| 86) Lakewood | NA | NA | 7–9 | 800 | 523 | 65 | 157 | 30 | 38.0 | 4.5 | 2 | 0 |
| 87) Ridgeroad | NA | NA | 7–9 | 1,000 | 645 | 65 | 206 | 32 | 37.5 | 6.0 | 1 | 1 |
| 88) Rose City | NA | NA | 8–9 | 400 | 433 | 108 | 164 | 38 | 32.5 | 7.0 | 2 | 0 |
| **Total:** | | | | 3,200 | 2,413 | 75% | 758 | 31% | 162.0 | 27.0 | 7 | 1 |
| **Pulaski County** | | | | | | | | | | | | |
| 89) Cloverdale | '58 | 3 | 7–9 | 747 | 840 | 112 | 235 | 28 | 41.5 | 6.0 | 2 | 0 |
| 90) Fuller | '53 | 2 | 7–9 | 722 | 485 | 67 | 167 | 34 | 52.5 | 16.0 | 3 | 1 |
| 91) Jksnvle/No | '55 | 3 | 7–9 | 946 | 594 | 63 | 149 | 25 | 32.5 | 8.0 | 2 | 1 |
| 92) Jksnvle/So | '53 | 2 | 7–9 | 896 | 570 | 64 | 154 | 27 | 32.5 | 7.0 | 2 | 1 |
| 93) Mabelvale | '53 | 2 | 7–9 | 847 | 611 | 72 | 39 | 6 | 31.0 | 5.5 | 2 | 0 |
| 94) Northwood | '79 | 1 | 7–9 | 1,000 | 976 | 98 | 59 | 6 | 47.5 | 7.0 | 3 | |
| 95) Robinson * | '54 | 3 | 6–8 | 772 | 477 | 62 | 94 | ·20 | 24.5 | 5.5 | 2 | 1 |
| 96) Sylvan Hls. | '56 | 2 | 7–9 | 971 | 949 | 98 | 105 | 11 | 47.5 | 9.5 | 3 | 1 |
| **Total:** | | | | 6,901 | 5,502 | 80% | 1,002 | 18% | 309.5 | 64.5 | 19 | 6 |

* Middle school

EXHIBIT 3

Table 10.   SENIOR HIGH SCHOOLS: FACILITIES, ENROLLMENTS, AND STAFF

| NAME | YEAR BLT. | CON-DI-TION | GRADES | CAPA-CITY | 1982 ENRLMT. | % UTIL-ZATN. | BLACK ENRLMT. | % BL. | 1983 TCHRS. | # BL. TCHRS. | # ADMRS. | # B ADMRS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Little Rock** | | | | | | | | | | | | |
| 97) Central | '26 | 1 | 10–12 | 1,909 | 1,989 | 104 | 1,106 | 56 | 94.5 | 31.0 | 5 | 3 |
| 98) Hall | '57 | 3 | 10–12 | 1,180 | 1,084 | 92 | 594 | 55 | 61.5 | 20.0 | 5 | 3 |
| 99) Parkview | '68 | 2 | 10–12 | 1,038 | 1,208 | 116 | 762 | 63 | 67.0 | 17.0 | 4 | 2 |
| Total: | | | | 4,127 | 4,281 | 104% | 2,462 | 58% | 223.0 | 68.0 | 14 | 8 |
| **North Little Rock** | | | | | | | | | | | | |
| 100) Northeast | '70 | 2 | 10–12 | 1,400 | 1,050 | 75 | 284 | 27 | 66.5 | 10.5 | 3 | 1 |
| 101) Ole Main | '34 | 2 | 10–12 | 2,000 | 1,083 | 54 | 393 | 36 | 69.5 | 11.5 | 3 | 1 |
| Total: | | | | 3,400 | 2,133 | 63% | 677 | 32% | 136.0 | 22.0 | 5 | 2 |
| **Pulaski County** | | | | | | | | | | | | |
| 102) Fair | '81 | 1 | 7–12 | 850 | 832 | 98 | 97 | 12 | 48.5 | 10.5 | 3 | 1 |
| 103) Jacksnvle. | '69 | 3 | 10–12 | 1,220 | 1,181 | 97 | 331 | 28 | 55.5 | 5.0 | 3 | 0 |
| 104) McClellan | '65 | 3 | 10–12 | 1,494 | 1,472 | 102 | 268 | 18 | 70.0 | 11.0 | 4 | 1 |
| 105) Mills | '69 | 3 | 10–12 | 946 | 1,020 | 108 | 409 | 40 | 50.0 | 11.0 | 2 | 0 |
| 106) Oak Grove | '62 | 3 | 7–12 | 672 | 825 | 123 | 119 | 14 | 43.0 | 6.0 | 3 | 1 |
| 107) N. Pulaski | '76 | 2 | 10–12 | 1,121 | 726 | 65 | 41 | 6 | 36.0 | 6.0 | 2 | 1 |
| 108) Robinson | '54 | 3 | 9–12 | 772 | 459 | 59 | 53 | 11 | 31.0 | 7.0 | 2 | 1 |
| 109) Sylvan Hls. | '56 | 3 | 10–12 | 896 | 864 | 96 | 119 | 14 | 43.0 | 7.0 | 2 | 1 |
| Total: | | | | 7,921 | 7,379 | 93% | 1,437 | 19% | 377.0 | 63.5 | 21 | 6 |