597 F.Supp. 1220 (1984)
LITTLE ROCK SCHOOL DISTRICT, Plaintiff,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Arkansas State Board of Education; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love; Bob Lyon; John Ward; Judy Wear; Leon Barnes; Marianna Gosser; Steve Morley; Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines; and Dale Ward, Defendants,
Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA); LRCA; Ed Bullington, Individually and as President of The Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, Individually and as President of The North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; and Milton Jackson, Individually and as a Non-Certified Educational Support Employee of the Little Rock School District, Intervenors,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua; Rev. Robert Willingham; Sara Matthews as next friend of Khayyam Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Dereck Miles; Rev. *1221 Robert Willingham on behalf of and as President of the Little Rock Branch of the NAACP; Lorene Joshua on behalf of and as President of the North Little Rock Branch of NAACP, Intervenors.
No. LR-C-82-866.
United States District Court, E. D. Arkansas, W.D.
November 19, 1984.
Philip E. Kaplan, John M. Bilheimer, Janet L. Pulliam, Little Rock, Ark., for plaintiff.
Wright, Lindsey & Jennings, Little Rock, Ark., Friedman & Koven, Chicago, Ill., for Pulaski County Special School Dist. No. 1, Faulkner, Moore, Hindman, Lowery, Dunn, Sain and Stender.
C.R. McNair, III, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for Ark. State Bd. of Educ., Hartsfield, Turnbow, Haines, Dupree, McDonald, Newton, Preston, Starling and Love.
House, Wallace & Jewell, Little Rock, Ark., for North Little Rock School Dist., Lyon, Ward, Wear, Barnes, Gosser and Morley.
Henry & Duckett, Little Rock, Ark., for Williams, Giddings, McCrary, Raines and Ward.
John W. Walker, Little Rock, Ark., for intervenors Joshua, et al.
Richard Roachell, Cearley, Mitchell & Roachell, Little Rock, Ark., for intervenors Knight, et al.

MEMORANDUM OPINION
HENRY WOODS, District Judge.

I. INTRODUCTION
This Court issued its Memorandum Opinion on April 13, 1984, Little Rock School District v. Pulaski County Special School District, et al, 584 F.Supp. 328 (ED Ark. 1984) finding, among other things, that the defendant districts had engaged in unconstitutional *1222 and racially discriminatory acts resulting in substantial interdistrict segregation. In its complaint the Little Rock School District (LRSD) prayed that this Court order consolidation of the school districts found in Pulaski County. Having determined that the substantial interdistrict violations could be rectified only by corresponding substantial interdistrict relief, the Court ordered the requested consolidation. The parties were informed that a hearing would be conducted on April 30, 1984 to consider the precise nature of the consolidation plan to be implemented.
At the April 30, 1984 hearing all parties were afforded an opportunity to present any testimony they desired concerning the remedial aspects of this case. The LRSD presented a plan that was authored primarily by Dr. Robert Dentler. Rather than offering alternative plans or constructive criticism of the LRSD plan, the defendant districts chose to attack the consolidation concept at every juncture and destroy the LRSD plan. Much of their effort seemingly was aimed at relitigating the liability portion of this case rather than assisting the Court in the formulation of a workable solution to the interdistrict violations which were found to have occurred. While the Court recognized the need for all parties to fulfill their duties as adversaries in this litigation, it was hoped that, without prejudicing their right to appeal, the defendant districts would take a more constructive approach to the remedial portion of this case. On numerous occasions subsequent to the April 30, 1984 hearing, the defendant districts voiced the opinion that this court foreclosed them from putting forth alternative remedies. Due to the negative approach taken by the defendant districts at the April 30, 1984 hearing (in the face of this court's need for their constructive participation) and the resulting cloud of confusion created by their complaints that they had been prevented from offering alternative remedies, the Court adhered to the suggestion of the Court of Appeals that the remedial hearings be reopened for the purposes of permitting these defendants to advance different remedies. A hearing to afford these defendants that opportunity, as well as to allow the various intervenors to participate in the remedial aspects of the case, was held beginning on July 30, 1984. See 738 F.2d 82.
Subsequent to the conclusion of this portion of the remedial hearings, Intervenors Knight, et al sought to substitute an exhibit reflecting the current Professional Negotiations Agreement (PNA) between the Little Rock Classroom Teachers Association and the LRSD, and the Pulaski County Special School District (PCSSD) sought permission to supplement the record to reflect offers to engage in some form of voluntary transfers of students among the districts.
PCSSD's motion to supplement the record to include the aforementioned correspondence is granted. The attorneys representing PCSSD are directed to meet with this Court's courtroom deputy clerk to facilitate the marking and listing of these exhibits for the record.
Intervenors Knight, et al's motion to substitute a current PNA is granted, and her attorney should likewise meet with the Court's courtroom deputy so as to ensure that this substitution of exhibits is accomplished.
The parties have submitted post-hearing briefs, and the Court has reviewed its April 13, 1984 Memorandum Opinion and the transcript of the remedial hearings. With this background and a view toward tailoring the remedy to fit the nature and extent of the constitutional violations, Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), the Court is prepared to render its opinion concerning the remedial aspects of this case.

II. ALTERNATIVE PLANS

A. The Pulaski County Special School District Plan

The PCSSD plan (PCSSD X 83) was generally described as voluntary with mandatory backup. Fritz Friendl, Administrator for Research, Planning and Quality Assurance for Pulaski County Special School *1223 District, coordinated efforts within the PCSSD staff and patrons in drafting the plan and presented the plan at the July 30, 1984 hearing. The plan retains the three autonomous school districts and relies on the development of specialty or magnet schools to attract students from one district to another. These magnet schools would be governed by a tri-district committee that would oversee the location of schools, student assignments, transportation, faculty and financing. The fatal flaw with this plan is its undue reliance on voluntary transfers. This Circuit held that "voluntary interdistrict transfers ... as a remedy for an intradistrict violation ... comply with constitutional standards," Liddell v. State of Missouri, 731 F.2d 1294, 1305 (8th Cir.1984) (emphasis added) and in some cases these "freedom of choice" features may still have some vitality. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1967). However, in the face of the dejure segregative acts found to have occurred and which are continuing, it would be naive to conclude that such a voluntary plan would succeed in this case. The PCSSD plan fails to adequately address the interdistrict segregative effects found to exist and cannot be approved. Little Rock School District v. Pulaski County Special School District, supra, findings of fact numbered 103-105.

B. The North Little Rock School District Plan

The North Little Rock School District (NLRSD) had consistently taken the position that they would not offer an alternative plan, notwithstanding their criticism that they had been denied such an opportunity. However, on the eve of the July 30, 1984 hearing, the NLRSD apparently reached the conclusion to support what has been referred to as the "Masem/Western Wedge Plan." One of the proponents of this plan was Dr. Paul Masem, former Superintendent of the LRSD and an expert retained by the Joshua Intervenors. Dr. David Armor, one of the NLRSD's expert witnesses, presented testimony in favor of such a plan.
The "Masem/Western Wedge Plan" calls for the NLRSD to retain its separate autonomous identity. The PCSSD north and west of Interstate 30 and south of the Arkansas River would become part of the LRSD. The LRSD east and south of Interstate 30 would become part of the PCSSD. Desegregation under the NLRSD plan would depend largely upon voluntary "M to M" (majority to minority) transfers.
The NLRSD plan defines a desegregated school as one having between 20-50% black enrollment. The plan would allow a deviation of five percentage points on either side of these parameters. A racially isolated school under this plan is defined as one having 90% or more students of one race. An Interdistrict Policy Board would be established to administer and coordinate the various provisions of the plan. This Board would include representatives from each district, as well as the Joshua Intervenors.
The Court finds that this plan, like the PCSSD plan, places too much reliance upon the voluntary motivations of the county patrons. The magnet school concept and "M to M" transfer theories have a great deal of public appeal. However, the Court agrees with Dr. Charles Willie's opinion that there are insufficient incentives offered by the NLRSD plan to expect the transfers under the "M to M" plan to be successful in desegregating the county schools. Any advances in the effort to desegregate these districts made by the suggested alterations in the various district boundary lines would be temporary. The approach suggested by the NLRSD plan fails to adequately address the interdistrict constitutional violations found by the Court and is the sort of half measure condemned by this Court in its earlier opinion.

C. The Intervenors Joshua Plan

The Intervenors Joshua chose not to advance any particular plan, but rather through their experts Masem and Dr. John Finger submitted a Position Statement on Consolidation (IX 2). Masem did offer testimony with regard to three options available *1224 to the Court which would not necessitate consolidation of all three districts. These options were primarily concerned with alterations in the boundary lines of the existing districts. Option A basically would establish the boundary lines as set forth in the "Masem/Western Wedge" plan espoused by the NLRSD. Option B would have the LRSD bounded on the south and east by Interstate 30 to the county line and on the north by the Arkansas River and Interstate 40 from the current NLRSD boundary to the county line. The NLRSD would administer the remaining portion of the county north of the Arkansas River, and the PCSSD would administer the remaining portion of the county south of the Arkansas River. Under Option C, the LRSD would exist as set forth in Option B and the remaining PCSSD would be consolidated with the NLRSD. These options are not supported by sufficient data to convince the Court that any of them would adequately remedy the constitutional violations found by the Court. In fact, Masem opined that consolidation of all the school districts within Pulaski County would be the most effective plan from a desegregation point of view (T. 3651). Some of the concerns expressed by these Intervenors have been taken into consideration by this Court in the drafting of this opinion and will, of course, be kept in mind during the finalization of the attendance zones, transportation routes, etc.

D. The Little Rock School District Plan

The LRSD plan (PX 63), often referred to as the "Dentler Plan," resulted from Dr. Dentler's consideration of various alternatives. His thorough consideration of alternative plans, as well as his extensive background of serving as a retained and court-appointed expert in school desegregation litigation, impressed upon this Court his dedication to an objective approach of tailoring the remedy to fit the violation at issue.
In what is referred to as the "St. Louis Case," Dr. Dentler (serving as a court-appointed expert) assisted in the formulation of a consent decree to assist desegregative efforts in that case. It was highly doubtful at the time the LRSD plan was drafted that any sort of consent resolution was possible in this case. Furthermore, the Court accepts Dr. Dentler's other reasons for rejecting this possibility. First, this case involves three districts whereas the St. Louis case involved twenty-five districts. There are also differences in the relative size of the student populations and differences in the degree of utilization of the magnet school concept in St. Louis vis-a-vis the three districts herein. Evidence that suburban school districts offered superior educational opportunities was not present in this case as it was in the St. Louis case, and there existed a greater number of surplus seats in the St. Louis case allowing greater planning flexibility. Finally, the St. Louis court did not need to address the specific constitutional violations found by the Court in this case. (T. 1766-70.) The voluntary measures incorporated to a large extent in the St. Louis area cannot be utilized here because of the absence of demographic and educational opportunity factors necessary to make a voluntary plan effective.
Although the magnet school-centered concept has many attractive features, it was rejected by Dr. Dentler. This Court accepts much of the criticism made by Dr. Dentler of this alternative. An interdistrict magnet concept cannot be the basis of any plan adopted by this Court to cure the constitutional violations. These districts are not adequately experienced in the magnet concept, and the Court finds that this approach is not economically feasible at this time. However, partial and increased future utilization of the magnet concept could enhance educational opportunities in this county, as well as assisting in making the court-imposed desegregative efforts more palatable.
The alternative of merely extending LRSD lines to be coterminous with the City of Little Rock boundaries would have at most minimal and temporary results and would not adequately address the constitutional *1225 violations found in this Court's prior opinion. Likewise, allowing the NLRSD to remain as an "island" within a PCSSD and LRSD consolidated district ignores the need to address the NLRSD's constitutional violations and would enhance the likelihood of creating further racial imbalances.
The Court also agrees with Dr. Dentler's conclusion that an interdistrict voluntary exchange of students would place a disproportionate busing burden upon black students. Furthermore, as Dr. Charles Willie testified, desegregation plans based upon freedom of choice have proved to be total failures. Green v. County School Board of New Kent County, supra, 391 U.S. at 440, 88 S.Ct. at 1695.
Dr. Dentler also considered a consolidation plan espoused by Dr. Colton in the St. Louis case which allowed for a mandatory redistribution of resources, teachers, etc. with a voluntary approach to the redistribution of students. This approach does not adequately address the constitutional violations found by this Court, and the voluntary aspect of student transfers would be less than adequate in accomplishing the required desegregation.
Finally, Dr. Dentler concluded that the only legitimate prospect of remedying the unconstitutional interdistrict violations and achieving a unitary status of any or all of the party districts is through consolidation. This Court agrees that a countywide interdistrict remedy must be utilized to correct the countywide interdistrict violation found to exist and that this is the only manner of placing the victims of this discrimination in the position they would have occupied absent the discrimination. Consolidation will eradicate the ill effects of these prior segregative violations, and the Court believes there are a number of reasons to conclude that consolidation can be successful in this case. (See, e.g., Little Rock School District v. Pulaski County Special School District, supra, findings numbered 2, 7-22.) Failure to utilize a countywide consolidation plan would exacerbate white flight problems in the county's residential growth.
The LRSD consolidation plan utilizes a geocoding process of arriving at student assignment areas and divides Pulaski County into six (6) subdistricts. Rather than calling for a specific racial balance (the constitution mandates no "particular degree of racial balance," Swann v. Charlotte Mecklenburg Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971)), this plan establishes a racial composition standard of (+) or (-) 25% of the racial makeup of the student population. The schools are to be equal in quality and have uniform grade structures (K-6); (7-9); (10-12) so as to enhance the ability of students to move about the district more freely. The parties must immediately begin compiling the data necessary to the development of the geocoded student assignment areas. The specific attendance zones of the various grades cannot be defined until the parties cooperate in the assimilation of this data. The final attendance zones must be submitted to the Court for its approval.
Transportation within the district, one of the more emotional issues of this consolidation, must be accomplished with a view toward minimizing the number of students that must be bussed. When the Court reviews the final attendance zones, the transportation routes will be strictly scrutinized to ensure that the final plans utilize the shortest possible routes to accomplish consolidation. Financially, the additional transportation burden should not impact too greatly on the overall budget requirements of the consolidated district.
While the magnet school concept is not acceptable to the Court as an overall remedy, Dr. Dentler's incorporation of magnet schools into the LRSD consolidation plan is sound. It encourages voluntary compliance with the goals of the consolidation plan in exchange for enhanced educational opportunities. Locating these magnet schools in areas populated primarily by blacks should make the transfer of white students from other parts of the district more attractive. The creation of a technical vocational magnet at Metropolitan High *1226 is a logical starting point for the use of magnet schools within the consolidated district (Little Rock School District v. Pulaski County Special School District, supra at 340, finding of fact number 14). The development of additional magnets can occur in the future where they complement the desegregation efforts of the consolidated district.
For desegregation to be successful under the LRSD consolidation plan, the administration must likewise reflect a desegregated staff at all levels and in all units. This must be one of the initial goals of the superintendent and board of the consolidated district. An interim board of directors will be selected by this Court, and it will be their duty to immediately retain the services of a qualified superintendent. These board members and the superintendent must be dedicated to the effective implementation of the LRSD consolidation plan. The board of directors will be responsible for submitting interim reports to the Court reflecting the efforts to implement the LRSD consolidation plan. The frequency of these reports will be no less than annual, but will be established in the future subsequent to appointment of an interim board and selection of a superintendent by that board. The Court sees no necessity at this time for a separate monitoring committee as suggested by Dr. Dentler.
The boundary lines within the district for the election of the members of the board of directors were significantly altered at the hearings (PX 74, 74A). Mr. Jim Lynch, Director of the Department of Management and Information Services of the University of Arkansas at Little Rock, compiled much of the data and developed this facet of the consolidation plan with the assistance of Mr. Howard Deimer, elections coordinator for the Pulaski County Election Commission. The altered electoral plan calls for a nine-member school board elected from nine single member districts. This method of selection increases the likelihood of minority representation on the board. The date of an election of persons to replace the interim court-appointed board will be established in the future.
Dr. Dentler's analysis of the fiscal aspects involved in implementing the Little Rock School District consolidation plan reflects that implementation can occur without significantly increasing the total budgets of the affected districts. Only with more refined study of the costs associated with implementing the LRSD consolidation plan by the new superintendent and board of the consolidated district can a determination be made as to the millage rate which must be uniformly applied within the consolidated district. See, e.g. Liddell v. State of Missouri, supra at 1320.
During the course of his testimony, Mr. Gene Reville, Superintendent of the Buffalo, New York School District and the court-appointed expert, stated it was his opinion that the success of any consolidation plan depended primarily upon its acceptance by the parents of the consolidated district's school children. The Court was impressed with his analysis of the Dentler plan. His testimony provided the sort of practical insight that only an experienced, professional school administrator could offer. While he approved Dr. Dentler's plan as an effective desegregation tool, the concerns he expressed about the refusal of the defendant districts to participate in the formulation of a consolidated plan should not be overlooked. These school districts have a continuing duty to obey and implement the orders of this Court. In the discharge of their court responsibilities, the districts owe their patrons an even higher duty. They must, during the planning and implementation of any consolidated plan, consult with their patrons and seek the adoption or modification by this Court of a plan which remedies the interdistrict violations found by the Court but does not ignore the educational and safety needs of the county children. With this in mind the three districts are directed to hold no less than three public meetings within their district for the purposes of explaining the LRSD consolidation plan to their patrons and allowing constructive criticism. These meetings must not be a forum for the condemnation of the *1227 consolidation concept. Rather they must solicit comments which will assist in the finalization of attendance zones and transportation routes. Each district's superintendent must be present and be familiar with the consolidation plan so as to be able to explain the plan to the district patrons. A transcript of these public meetings should be submitted to this Court at the cost of each district, and these meetings must be held no later than March 29, 1985.

E. Input of Knight Intervenors

The primary focus of the post-hearing submission of the Knight Intervenors concerned securing and protecting the contractual rights of the teachers employed by the three districts. Their interests will be protected by the Court. However, it would be premature at this time to impose any particular contract on the consolidated district. The Court will involve itself in this potential contractual dispute only when it becomes apparent that the interim board is unable to come to an agreement with its teachers. The Court realizes the importance of teacher support and participation in the successful implementation of any remedy and will address any financial and assignment disputes between the new board and the teachers when and if they arise. Of course, the parties should not construe this portion of the opinion as an expression of the Court's intention to become an arbitrator of all disputes arising between the district and its teachers.

III. THE STATE DEFENDANTS
The LRSD requests at this time that the Court enter findings concerning the basis for retaining the state defendants in this case for remedial purposes. In its earlier opinion the Court advised these defendants that they would remain in the case for remedial purposes. LRSD v. Pulaski County Special School District, supra at 353.
The State Board of Education has, by statute, general supervision over all public schools in the State of Arkansas. Ark. Stat.Ann. § 80-113. In addition to that general responsibility, the State Board and the Department of Education have numerous specific duties, including the approval of plans and expenditures of public school funds for new school buildings (Ark.Stat. Ann. §§ 80-113, 80-3506; T. 775); review, approval and disapproval of local school district budgets (Ark.Stat.Ann. §§ 80-113, 80-1305; T. 773); administration of all federal funds for education (Ark.Stat.Ann. §§ 80-123, 80-140); disbursement of State Transportation Aid Funds to local school districts (Ark.Stat.Ann. §§ 80-735, 80-736); assisting school districts in the operation of their transportation system (T. 774); lending funds from the State Revolving Loan Fund to local school districts (Ark. Stat.Ann. § 80-942); approval or disapproval of bonds issued by local school districts (Ark.Stat.Ann. § 80-1105; T. 775); advising school districts regarding the issuance of bonds (T. 777); and regulation of the operation of school buses (Ark.Stat.Ann. §§ 80-1809, 80-1809.2).
The State Board of Education has broad statutory authority to supervise the public schools of the state generally, and to take what action it may deem necessary to "promote the physical welfare of school children and promote the organization and increase the efficiency of the public schools of the State." Ark.Stat.Ann. § 80-113.
The State Board of Education has the authority to promulgate regulations concerning the earmarking and use of funds used by local school districts (Ark.Stat. Ann. § 80-1305), the use of federal education funds by local school districts (Ark. Stat.Ann. § 80-142) for the administration of State Transportation Aid Funds by local school districts (Ark.Stat.Ann. § 80-735), and for the operation of school buses by local districts (Ark.Stat.Ann. §§ 80-1809, 80-1810).
The State Board of Education may lend funds from the State Revolving Loan Fund for the purchase of school buses and other equipment, for making major repairs and constructing additions to school buildings, for the purchase of sites for new school buildings, for the construction of new *1228 school buildings, and for the purchase of surplus buildings. Ark.Stat.Ann. § 80-942.
The State Board of Education has never acknowledged its affirmative duty to assist the local school districts in their desegregation efforts. In the performance of its statutory duties, as set forth above, the State Board has never promulgated any rules or guidelines which would encourage the local districts to eliminate discrimination in their school systems. These omissions have had their greatest impact on the issues of school construction, student transportation, and financial assistance to local districts. Had the State Board taken affirmative steps in providing incentives to local school districts to comply with desegregation requirements, desegregation within the school districts in Pulaski County would have been greatly enhanced. These deficiencies in the State Board's discharge of its affirmative duty to encourage desegregation in the local school districts had an interdistrict effect upon the Little Rock, Pulaski County, and North Little Rock school districts. Other branches of the State, as set forth in the court's earlier opinion, Little Rock School District v. Pulaski County Special School District, supra at 328-335, share responsibility with the State Board for these constitutional violations, but the State Board must be the remedial vehicle for their violations as well. The State Board therefore has remedial responsibilities with respect to this case. Adams v. United States, 620 F.2d 1277 (8th Cir.1980 (en banc)), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29; Liddell v. State of Missouri, 731 F.2d 1294 (8th Cir.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 82, 83 L.Ed.2d 30. The precise nature of these financial and oversight responsibilities must await further refinement of the consolidation plan and development of a budget for such consolidated district.

IV. SUMMARY
The three districts in this case have an affirmative obligation to eliminate segregation "root and branch." Swann v. Charlotte-Mecklenburg Board of Education, supra. Having failed in the discharge of this responsibility, it is the duty of this Court to fashion a remedy of a nature and scope sufficient to meet the constitutional violations found to have occurred. Milliken v. Bradley, supra; Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). This Court cannot shrink from this duty and in approving a remedy, the Court must restore "the victims of the discrimination as nearly as possible to the position they would have occupied absent that discrimination." Liddell v. State of Missouri, supra at 1306.
The Court therefore approves the LRSD consolidation plan and directs that the parties undertake the implementation of said plan.